FILED

2017 May-19  PM 02:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ALABAMA

SOUTHERN DIVISION

| | | |
|---|---|---|
| KESHA LASHAWN BOGUS, | ) | |
| Plaintiffs, | ) | |
| v. | ) | Civil Action Number: |
| CITY OF BIRMINGHAM, | ) | |
| ALABAMA, BIRMINGHAM | ) | |
| POLICE DEPARTMENT, | ) | |
| MAYOR WILLIAM A. BELL, SR., | ) | |
| PAUL IRWIN, and HERMAN | ) | |
| HARRIS, | ) | |
| Defendants. | ) | |

COMPLAINT

Now comes the Plaintiff, KESHA LASHAWN BOGUS, by and through her undersigned counsel, and for complaint against the Defendants, and each of them, jointly and severally, shows unto this Honorable Court the following:

INTRODUCTION

This action is brought by the Plaintiff, KESHA LASHAWN BOGUS, for race, gender and pregnancy discrimination and retaliation in employment pursuant to Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991). This action is also brought to secure relief for violations of rights guaranteed by the United States Constitution and actionable

1

under 42 U.S.C. §1983 ("Section 1983") and 42 U.S.C. §1981 ("Section 1981").  Plaintiff also makes claims pursuant to the common law of the State of Alabama.

## JURISDICTION

1.      Jurisdiction is specifically conferred upon this United States District Court by the aforementioned statutes, as well as 28 U.S.C. §§1331, 1343 and 1367 (as to pendent state law claims).  Jurisdiction is also appropriate under 42 U.S.C. §§1981, 1983, as amended by the Civil Rights Act of 1991 and the 14th Amendment to the United States Constitution.

## VENUE

2.      Venue in this judicial district is proper under 28 U.S.C. §1391(e)(1), because the Birmingham Police Department  operates and is headquartered in this district, and 28 U.S.C. §1391(e)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this district. Venue in this judicial district also is proper under 28 U.S.C. §1391(e)(3), because the principal place of business of the Mayor and the Police Department of the City of Birmingham is in this district.  Plaintiff, Kesha LaShawn Bogus, and Defendants William A. Bell, Sr., Paul Irwin and Herman Harris all live in Jefferson and Shelby Counties, Alabama and within the jurisdiction of this Honorable Court.

## PARTIES

3.      Plaintiff resides in Mt. Olive, Alabama in Jefferson County, Alabama, and has at all times material herein, resided in Jefferson County, Alabama. She is over the age of twenty-one years and is competent to bring this action.

2

4.    Defendant, CITY OF BIRMINGHAM, ALABAMA, is a municipal corporation organized and existing under the laws of the State of Alabama.  It is located at 710 North 20th Street, Birmingham, Alabama 35203 and at the time of the acts complained of herein, employed 15 or more persons.

5.    Defendant PAUL IRWIN was, at all relevant and material times herein mentioned, a Captain in the Birmingham Police Department. He is a Caucasian male, is over the age of twenty-one years and resides in Trussville, Alabama and within the jurisdiction of this Honorable Court.  Irwin was directly and indirectly responsible for the unlawful personnel actions regarding the Plaintiff, her persecution during her employment by the department's West Precinct, the deprivations of due process manifest during her employment at the West Precinct, punitive action taken against her following her assignment to the West Precinct and other unconscionable actions directed against her. He is sued in his official and individual capacities.

6.    Defendant HERMAN HARRIS is an employee of Mayor William Bell and, at all relevant and material times herein, served as the Mayor's Chief of Security.  He is over the age of twenty-one years and is a bona-fide resident of the City of Chelsea, Shelby County, Alabama and within the jurisdiction of this Honorable Court.  In 2010, Plaintiff was assigned to the Office of Mayor Bell and her employment activities were directed by Harris beginning in 2014.  Harris, as the Mayor's security chief, acted as an agent of the City of Birmingham when he engaged in unlawful conduct against the Plaintiff and her employment. He is sued in his individual and official capacities.

7.    Defendant, WILLIAM A. BELL, SR., is the Mayor of the City of Birmingham, Alabama who resides in the City of Birmingham in Jefferson County,

3

Alabama and within the jurisdiction of this Honorable Court.  He is sued in his individual and official capacities.

8.      Plaintiff is a black female police Sergeant and is over the age of twenty-one years who has been employed by the Defendant as a police officer since 1996 and, beginning 2015, a supervising Sergeant, for more than 20 years.  The terms and conditions of her employment are set forth in the Birmingham Police Department Rules and Regulations cited throughout this Complaint by procedure number.  Beginning in 2014, while employed by the Office of the Mayor of the City of Birmingham, William A. Bell, Sr., she began to be routinely treated less favorably than similarly situated white male officers.

9.      Plaintiff has retained the undersigned attorney on a *pro bono* basis but prays that, if she prevails in this action, she will be awarded attorney's fees pursuant to 42 U.S.C. §1988 and other authority related to the same.

<u>PLAINTIFFS' E.E.O.C. CHARGES</u>

10.     On or about March 31, 2015 Plaintiff filed a charge of discrimination with the Birmingham District of the E.E.O.C. This charge is attached hereto as Exhibit "A".

11.     Following a response by the City of Birmingham which contained a number of material misstatements of fact, procedure and law, Plaintiff, by and through her then attorney, Gayle H. Gear, filed a response to the same on August 17, 2015.  This response is attached hereto as Exhibit "B".

12.     On January 19, 2016, Plaintiff filed a supplement to her charge of discrimination with the E.E.O.C. in which she described wrongful treatment in retaliation for her having sought redress internally and through the procedures established by the

E.E.O.C., which retaliation continues through the date of the filing hereof. This supplement is attached hereto as Exhibit "C" and is incorporated herein by reference.

13.    More than one hundred eighty (180) days have passed since the filing of said charges, and the E.E.O.C. issued Plaintiff a Notice of Right to Sue letter on February 22, 2017.  This suit has been filed within the prescribed 90 period following the issuance of the Notice of Right to Sue, which is attached hereto as Exhibit "D".

14.    Plaintiff has exhausted all administrative remedies available to her prior to bringing this action.

15.    Plaintiff has complied with all conditions precedent to bringing all aspects of this action, including, but not limited to, administrative and appellate remedies to which she were theoretically entitled under state law.

STATEMENT OF FACTS COMMON TO ALL COUNTS

16.    At all times material herein mentioned, Defendant, City of Birmingham, was an employer within the meaning of 42 U.S.C. §2000(b) and is subject to and governed by the provisions of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e, et seq.

17.    At all times material hereto, Plaintiff was an employee within the meaning of 42 U.S.C. §2000(f).

18.    As a public employee, Plaintiff was possessed of a property interest in her employment within the meaning of 42 U.S.C. §1983 and the Fourteenth Amendment to the United States Constitution.

19.    Defendant, City of Birmingham, is a political subdivision of the State of Alabama.  It has established a Police Department in which the Plaintiff is employed.  The

Birmingham Police Department is the law enforcement subsidiary of the City of Birmingham.

20. Plaintiff's employment was largely uneventful from the standpoint of racial or sexual discrimination or the remaining aspects of her claims as set forth herein until 2010, when she was assigned to the detail of Mayor Bell.

21. Beginning with that assignment, the City of Birmingham, its Police Department and personnel assigned to the Office of the Mayor, including Mayor Bell himself, committed repeated infractions of established Rules, Regulations and Procedures in their interactions with the Plaintiff. However, because of the refusal of the City and its Law Department to facilitate the provision of documents important to this action, and despite the repeated requests of Plaintiff and her counsel, Plaintiff is unable to identify all such violations herein.

## Plaintiff's Assignment to Defendant Mayor William Bell's Office

22. Plaintiff became aware that Bell had begun to employ various family members and close personal associates or family friends in various positions throughout the city's governmental matrix. Plaintiff was not related to Bell in any way, nor did she occupy any position of authority within the Bell's security detail. She was thus unprotected during the events giving rise to this complaint, unlike so many other individuals with whom she was required to interact.

23. Among those family members of Mayor Bell was Sgt. Herman Harris, Bell's cousin, and a fellow member of ΚΑΦ fraternity, who was appointed head of Bell's security in July of 2014. Although inexperienced in matters of security, and although the Plaintiff reported according to the chain of command established by the Birmingham

6

Police Department, she was required to comply with orders given by Bell through the said Herman Harris.

24.     Sgt. Harris' appointment was supposed to be for thirty (30) days, but was extended indefinitely by Defendant Bell in August 2014.

25.     Harris began to implement policies and procedures not properly approved by Chief Roper, all in violation of Procedure No. 100-4(V)(B).  None of them were issued on an emergency basis. (See, Procedure 100-4(V)(C).

26.     At one point during 2014, Herman Harris began to importune the Plaintiff romantically, overtures the Plaintiff rebuffed.

27.     Harris nevertheless continued in his pursuit of the Plaintiff, in violation of Bell's and the Police Department's sexual harassment Procedures No. (110-1(IV)(A)(1), (as regards Chief A.C. Roper, if he was notified), 110-1 (IV)(A)(2)(d) and 109-25(A) and (C), and Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 (amended in 1972, 1978 and by the Civil Rights Act of 1991).

28.     Because of the Plaintiff's rejection of Harris' romantic overtures, she began to suffer the loss of certain emoluments of her employment, occasioned by Harris and well-known to Bell.

29.     On information and belief provided by the City of Birmingham in connection with its defense of Plaintiff's E.E.O.C. charge, Bell's Director of Communications, April Odom, had made romantic overtures to then Chief Deputy William R. Tubbs during Plaintiff's assignment to Bell's office.

30.     Following an incident outside Logan's Restaurant in Fultondale, Alabama between the Plaintiff and Tubbs, Bell or Patton received a complaint from April Odom

7

against the Plaintiff.  As stated, Odom was apparently romantically interested in Tubbs and made her report improperly and vindictively in order to diminish her competition for Tubbs' affections, Plaintiff Kesha Bogus.  Because of Odom's improper and false report, in September of 2014, the Plaintiff was required to undergo an irregular investigation, one handled primarily by outside counsel Matt Beam, all in violation of Procedure No. 100-4(IV)(A)(1) & (2), which deals with the proper handling of complaints.

31.    The assignment of the Odom complaint to outside counsel was very unusual and, because the Plaintiff was a police officer, should have been referred to IAD pursuant to established procedure.  Additionally, she was never provided with the employee notification form 739 required by official policy and procedure.  Instead the city opted for the unusual procedure outlined herein.

32.    The allegations made by Ms. Odom were ultimately determined by Mr. Beam to have been unfounded and the matter was dismissed during the week of October 13, 2014.

33.    However, during the course of the investigation of the incident and in response to a request for information by the City's outside counsel retained to resolve the issue, Matt Beam, Plaintiff reported to Mr. Beam that she believed she was being discriminated against because of her gender and because she had rebuffed the sexually harassing overtures of Herman Harris.

34.    Specifically, she had been denied overtime compensation while similarly situated male employees, Jeffrey Wick and Eric Smith, were assigned substantial overtime duties and compensation.  She complained in correspondence to Harris dated October 9,

8

2014 of such disparate treatment by him, a complaint which would come back to haunt her in the form of a dressing down by Bell, defendant herein, shortly thereafter.

35.    While the Beam investigation was ongoing, during the Magic City Classic Parade on October 25, 2014, Bell was a major participant.  At one point during the procession, he became obviously angry and irritated, and called the male members of his security detail into the Chevrolet Suburban in which he was riding.  These members included Herman Harris, Jeffrey Wick and Eric Smith.  Plaintiff could hear Mayor Bell's raised voice from her position outside the Bell's vehicle.

36.    Plaintiff was then summoned by Bell, who stated, in all material respects, and with the vulgarity referenced accurately herein, the following: "I don't give a shit about your personal relationship. I know about the email you sent saying that you were the only female in the unit.  I know what that means."  At that moment, Plaintiff became aware that the City's retaliation had begun, as this confrontation constituted retaliation in itself.

37.    Despite her documented complaint to the City's outside counsel, Mr. Beam, regarding the disparate treatment she had received, Bell's actual knowledge of the circumstances, and as a direct and proximate consequence of the same, Plaintiff continued to be denied the emoluments of employment aforesaid that were accorded similarly situated male employees.

38.    On September 27, 2014, while the Beam investigation continued, Chief Deputy Tubbs was contacted by Captain Jerry Wiley, then a friend of Tubbs', who informed Tubbs that April Odom, the complaining party in Beam's investigation, had contacted him to ascertain the status of her complaint against the Plaintiff.  Allegedly,

Wiley informed Odom that he couldn't talk about the case, that an investigation was commencing, and that she should drop her complaint because Wiley intended to tell the truth and that his testimony might get her fired.

39.     Plaintiff immediately learned about this communication from Tubbs, and wrote the City's Chief of Operations, Jarvis Patton about it, requesting that he not permit Bell to drop the complaint, that she wanted to be heard and be afforded due process in defending herself against the allegations that were demonstrated subsequently to have been false and wholly inappropriate.  In effect and intent, she requested a name-clearing hearing.  This request was denied.

40.     During the week of October 13, 2014 following his handling of the Odom complaint on behalf of the city, Mr. Beam, acting as an agent for the City of Birmingham and/or Mayor William Bell, proffered the Plaintiff a release which sought to absolve the city of any liability for its treatment of her, and attempted to pressure her into signing the document, leaving her alone in the conference room for over an hour with the release placed in front of her at the table.  She refused to do so, although Chief Deputy Tubbs and April Odom did sign a similar document proffered by Beam. Twelve days later she was subjected to vulgar abuse by Defendant Bell.

41.     Plaintiff believes her refusal to sign the release led to significant adverse employment actions and other indignities at the hands of various members of the Birmingham Police Department, Bell and members of his staff.

42.     The "personal relationship" to which Bell referred during the Magic City Classic involved the Plaintiff's romantic involvement with then Deputy Chief Tubbs, a

white male, which began in 2013 and continued for a lengthy period of time until the Plaintiff was summarily placed on administrative leave on January 2, 2015.

43. Plaintiff was surprised at the dressing down she received from Bell because Bell had encouraged her to accept the attentions of Deputy Chief Tubbs on several occasions and was well aware of their ongoing relationship.

44. Over the course of succeeding months, Plaintiff suffered increasingly hurtful instances of discrimination because of the events described above, and others. She became despondent and depressed and feared for her career with the Birmingham Police Department.

45. Still, her relationship with Deputy Chief Tubbs continued.

46. On September 23, 2014, and although he was still married but in the process of divorcing his wife, Tubbs proposed marriage to the Plaintiff and gave her an engagement ring in the security office of Mayor Bell's office.

47. Soon thereafter, in October 2014, Plaintiff became pregnant by Chief Deputy Tubbs. Ultimately, she would deliver of their child in July 2015.

48. Although there has been a policy in force and effect for many years prohibiting gossip and "scuttlebutt" affecting morale (e.g. Procedures Nos. 100-4(II)(I)(4), 203-2(II)(B), 203-3(III)(J), 204-2 and 205-1(C), and 209-25(3)(XIII)), the relationship between the Plaintiff and Tubbs soon became the subject of much speculation and unofficial discourse among high ranking appointed and elected officials, all in violation of Procedure No. 109(3)(XIII).

49. The summary disposition by Mr. Beam of Odom's complaint denied the Plaintiff the name-clearing hearing she had officially requested through Jarvis Patton.

50.     In December 2014, Tubbs gave the Plaintiff a nice Christmas present. Soon thereafter, he spent the New Years' holiday out of town, failing or refusing to return Plaintiff's calls and text messages.

51.     Fearing abandonment at that most crucial time, pregnant and with a physical chemistry changing as a result of the same, Plaintiff entered Tubbs' loft in downtown Birmingham using a key card he had given her, and made an arguably inappropriate gesture to inform Tubbs that she was upset at the thought that he might have been seeing another woman and had abandoned her once she became pregnant.

52.     On January 2, 2015, Plaintiff presented herself at Tubbs' office and engaged him in his office regarding her suspicions; she expressed concern but was not inappropriate in her demeanor.

53.     For reasons unknown to the Plaintiff, Tubbs filed a complaint against her with IAD and Plaintiff was caused to undergo another investigation.  He later withdrew the complaint.

54.     In connection with the Tubbs complaint, Plaintiff was not provided with the Employee Notification Form required by established procedure, Police form 729 provided for in Procedure No. 110-1(IV)(A)(2)(d).  Without any preliminary investigation or procedural due process, Plaintiff was immediately placed on Administrative Leave, removed from her detail at Bell's office, suspended for two days, required to attend counselling, theoretically pursuant to R&R Procedure 101-7(V)(C), *et seq*., and eventually reassigned to other duties.  However, the order to report for counselling was done in a manner inconsistent with the foregoing procedure in that Lt. David Grayson of IAD

12

assigned to the matter was not legally authorized to issue the order at the time it was issued.

55.     Before the ink was dry on the order placing her on administrative leave, Tubbs was called before IAD and charged with misconduct for reasons which the Plaintiff elects not to relate herein.

56.     At the conclusion of the IAD investigation Plaintiff was substantially exonerated, but was found to have engaged in conduct unbecoming a police officer as a result of her having entered Tubbs' loft and having made the gesture of fear and concern aforementioned.  Still, she was not never provided with Form 466 as required by Procedure No. 110-1(II)(C)(1) and was denied procedural due process as a result of such failure or refusal, and was thus denied any appeal right she may have had.

57.     Tubbs' misconduct was determined to have been sustained, but he was not disciplined in any meaningful way, was permitted to take paid FMLA leave during the investigation for reasons that were described inconsistently in the official documentation related to the issue, and to retire on a full pension.

58.     Mr. Tubbs is no longer employed by the City of Birmingham in any capacity.

59.     This disparate treatment has never been explained by the City of Birmingham or its counsel.  In fact, Plaintiff and her undersigned counsel attempted to obtain records to which she was duly entitled by law under Procedure 110-1(XIII) from IAD, the City Attorney's office, Attorney Matt Beam, and others, but have received no cooperation of any kind from any of those persons or entities. Attached hereto as Exhibit "E" is correspondence forwarded by City Attorney Thomas Bentley denying all of

13

Plaintiff's counsel's request for documentation, which denial has prevented the Plaintiff from presenting a more detailed factual statement in this Complaint.  Plaintiff prays that she will be permitted to amend her complaint as additional facts are discovered.

60.     Stated succinctly, the Plaintiff's conduct paled in comparison to that of Tubbs, yet she has been subjected to gossip, innuendo and retaliation, while Tubbs was treated with the respect and dignity due any long-serving officer of the Birmingham Police Department, of whatever rank or station, and to which Plaintiff was, or should have been, likewise entitled.  In so doing, officials of the Birmingham Police Department violated Procedure No. 203-2 (II)(B).

61.     The Plaintiff avers that, during her tenure with Bell's office, other members of his personal staff have committed infractions far more serious than that alleged against the Plaintiff, infractions that may have violated criminal statutes and certainly violated duly promulgated, official rules and regulations.  These individuals suffered no significant discipline, if any, while the Plaintiff's IAD investigation continued well beyond the procedurally mandated ninety (90) days and was not closed until June 13, 2016, as Plaintiff learned only yesterday.

62.     Likewise, members of Bell's security staff engaged in conduct any reasonable public official would consider unbecoming, yet such conduct went either unnoticed or unpunished, in contrast to the manner in which the Plaintiff was treated by the Bell, Irwin, Harris and the Birmingham Police Department.

63.     The foregoing is important for several reasons.  In its response to Plaintiff's charge of discrimination filed March 31, 2015, the City stated that because the Plaintiff was assigned to the Defendant Bell's office, she was not a police officer reporting to her

chain of command, but was inexplicably the subject to the command of Bell, other individuals whose job titles or descriptions were unknown to the Plaintiff, and Bell's security chief, Sgt. Herman Harris. This assertion is manifestly false, according to established policy and procedure; however, assuming the City's position on this issue is accurate, Plaintiff avers the following:

64. Plaintiff avers that, insofar as her interaction with Bell or his staff was concerned, Herman Harris was Bell's *alter ego* and served as Bell's proxy in most instances related to the Plaintiff's employment, but that she actually and procedurally reported to appointed police officials outside Bell's office who were largely unaware of the activities of personnel within Bell's office.

65. Plaintiff found herself in a snake pit, where city employees in Bell's office were engaged in numerous violations of law and procedure, some of which she personally observed, and she reported several serious infractions in accordance with established procedure. If she had not made the subject reports, she would have been subject to discipline.

66. Among the infractions of which the Plaintiff was aware and/or which she reported to her superiors in Bell's office, are the following:

a. One employee, Kwani Dickerson, a close personal friend of Defendant Bell and his wife, who worked on his campaign, was theoretically employed by the city of Birmingham, but rarely, if ever, reported for work;

b. While Plaintiff was assigned to Bell's office, April Odom, Bell's communications director, rented cars using the city's account for personal purposes and failed to pay for the cost of such rentals. When such impropriety was

called to the attention of Bell, he merely required Ms. Odom to repay the city for the cost of the rentals.  On information and belief, Bell employed the subterfuge of allowing Ms. Odom to take out a "pension loan" to repay the City.   She was disciplined in no other fashion;

c.       April Odom likewise received official checks from the city for travel expenses, but when she did not use the funds for travel she was supposed to have repaid the city for such unused expenses.  She failed to do so until the circumstances were reported to city officials and she was required to repay the city such funds when she was caught violating established procedure.  She was disciplined in no other fashion;

d.       On information and belief, on or before April 2013, April Odom was also charged with the crime of presenting checks subsequently returned "NSF" in violation of §13A-9-13.1, Code of Alabama 1975, as amended.  When this occurred, Jarvis Patton, the Chief of Operations for the City of Birmingham, asked then Deputy Chief Tubbs to assist her with these legal matters.  In response, and on information and belief, Tubbs merely advised Odom to pay the fines associated with conviction of such offenses.  She was not otherwise disciplined.

e.       Erskine Faush, Jr., aka "Chuck", a close friend of Bell, and his Chief of Staff, although not a sworn police officer, was issued a Chief's badge and permitted to install official police department sirens and blue lights at City expense, a violation of §32-5A-115 and §32-5-1-1.1, Code of Alabama 1975.  He was not disciplined in any fashion.

16

f. In October 2014, Faush, in direct violation of §32-5A-115 and §32-5-1-1.1, Code of Alabama 1975, authorized part-time City Attorney, Michael Choy, who does contract work for the City of Birmingham and is an extremely close personal friend of Bell who is not a sworn police officer, to install official police sirens and blue lights on his personal vehicle, a Chevrolet Tahoe, at City expense, until Plaintiff reported the issue to her supervisor, Jarvis Patton, who ordered the sirens and blue lights removed;

g. Plaintiff observed that Kelli Solomon, another close, personal friend of Bell, is employed as his secretary in theory, but rarely reports for work, having been granted some kind of dispensation by Bell, for reasons unknown to the Plaintiff, to make her own schedule and otherwise conduct herself as she saw fit;

h. Defendant Bell's goddaughter, Tara Oates and her sister, Faye, were employed at the Crossplex, a recreational center located in Five Points West during Plaintiff's tenure with the Bell's office. On information and belief, Tara Oates was investigated by Debra Hawes Crook, the Assistant City Personnel Director, and an attorney, for alleged misconduct, including theft and displaying pornography. Defendant Bell terminated Ms. Crook's employment or, as the action might otherwise be characterized, failed to renew her appointment, as she got closer to concluding her investigation of Tara Oates. Crook, while Assistant Personnel Director, had attempted to assist the Plaintiff in the prosecution of her rights under established policy, and her summary termination instilled the Plaintiff with fear of similar retaliation and insecurity in her continued employment;

i.      On information and belief, Jarvis Patton maintains a file or other

documentary evidence covering an extended period of time related to April

Odom's performance in office, some of which contents were provided to him by

the Plaintiff.

67.      Unfortunately, some of the individuals involved in incidents violative of

law, policy or procedure were close friends or relatives of Bell, and Plaintiff personally

observed or was otherwise privy to many such incidents as a result of her assignment to

Bell's office.  She does not wish to scandalize anyone by recounting those incidents herein

except to state that her having witnessed or otherwise having personal knowledge of them

affected her treatment by officials of the City of Birmingham.

68.      She was not accorded the same charitable treatment by Bell nor any of his

subordinates as were other city employees who worked in his office and who had

committed infractions of procedure far more serious than the Plaintiff's.  Yet, the City

alleged in its response to the Plaintiff's E.E.O.C. charge that she had engaged in private

conduct which demanded the action taken against her, stating that "her position required

judgment and conduct that would not adversely reflect on the Mayor."

69.      Plaintiff was greatly disturbed by much of what she observed in the

conduct of Defendant Bell's official and unofficial, public and private, activities.  She was

required to provide security for Defendant Bell's and Erskine Faush, Jr.'s private meetings

on some occasions, although Herman Harris and the male members of their security

details were the primary recipients of the overtime benefits associated with such

protection.  These protective services were troubling to the Plaintiff, owing to the nature

of the Bell's and Faush's private (and sometimes public) activities for which security was

assigned and paid for by the City of Birmingham, but which was manifestly unnecessary. The defense proffered by the City in response to her E.E.O.C. charge regarding an adverse reflection upon the Mayor seemed hypocritical, if not laughable, to the Plaintiff at the time she first learned of it, for the reasons set forth herein.

70.     As alleged above, Plaintiff refused to sign the release prepared by the City's outside counsel, Matt Beam, in early October 2014. She was thus perceived as uncooperative and not a "team player" by attorney Beam, others to whom he disclosed his investigation and, most importantly, Defendant Bell. Retaliation followed, as it did after she filed her charge of discrimination with the E.E.O.C. on March 31, 2015 and the supplement on January 19, 2016.

71.     Additionally, although the IAD investigation into the January 2, 2015 incident determined the most serious allegations to have been unfounded, from that time forward, elected and appointed officials' and supervisors' attitudes toward her changed markedly. Plaintiff was never informed of the findings of this investigation, in violation of Procedure 100-1(IX), *et seq.* and was not accorded an opportunity to defend herself against subsequent gossip and misreporting by municipal officials.

72.     She was not restored to her position with Bell's office for reasons unclear to her, but which she believes were related to suspicions that she was dissatisfied with her treatment by Herman Harris and other personnel in Bell's office, including having to "cover-up" for the Bell's and his Chief of Staff, Erskine "Chuck" Faush's activities outside the scope of legitimate municipal business, and her refusal to execute the aforementioned release prepared by outside counsel, Matt Beam.

73.     For several months prior the birth of her baby, and following her having been placed on Administrative Leave, Plaintiff languished in the Community Resource Division, without benefit of badge, identification or gun, even though she had been exonerated by Beam in connection with the September 2014 incident, (again, vindictively reported by April Odom), which exoneration was unknown to the Plaintiff until recently. Likewise the findings of IAD regarding the January 2, 2015 incident were not disclosed to her in violation of Procedure No. 110-1(V)(F)(7)(e).

74.     The Plaintiff's and former Deputy Chief Tubbs' baby was born on July 7, 2015, following which Plaintiff was on standard maternity leave under the FMLA until approximately October of that year.

75.     Because of the birth of her child, as well as the treatment she had received from her superiors, Plaintiff suffered from post-partum complications and depression clearly documented by the counsellor whom she was required to see by Lt. David Grayson and other members of the Administration of the Police Department.  She complied with that directive, yet no one in her chain of command bothered to inquire later at any time as to her physical or emotional status nor to obtain information from her appointed counsellor.

76.     By October 2015, Plaintiff had been without credentials for ten months, had not be able to continue to qualify at the pistol range (which could have disqualified her from service (Procedure No. 113-1(X)), and had been otherwise delayed in her career path.  She notified her superiors of such facts several times in succeeding weeks.

77.     In October 2015, the City of Birmingham commendably promoted the Plaintiff to the rank of Sergeant, the Plaintiff having successfully passed the required examinations for such promotion during the summer of 2015.

78.     However, on information and belief, no captain in charge of any of the four police precincts into which the City of Birmingham is divided wanted the Plaintiff assigned to his or her precinct, largely due to the proliferation of gossip, rumor and innuendo emanating from police headquarters, IAD or elsewhere within the City hierarchy related to the Plaintiff's relationship with a white supervisor, her having been delivered of a bi-racial baby and other reasons outlined herein, all in violation of Procedure No. 109(30(XIII).

79.     Although not related by the Plaintiff in any way, each of the captains to whose precincts to which she would have to be assigned had been made aware of the difficulties Plaintiff had experienced while working at Bell's office and had drawn negative conclusions from gossip, rumor and innuendo, although the Plaintiff was completely exonerated by Beam and largely so by IAD of the most serious of the frivolous, unfounded allegations made against her.

Plaintiff's Assignment to West Precinct

80.     Between the date of her involuntary separation from Bell's office and her reassignment to West Precinct in October 2015, rumors Plaintiff believes emanated from headquarters, from within IAD or elsewhere within the City administrative hierarchy regarding her and former Deputy Chief Tubbs had been circulating around the department, and Plaintiff had been tarred with a very broad brush as uncooperative and difficult.

81.     Plaintiff was then assigned to West Precinct to serve under Captain Paul Irwin.

82.     With that assignment, Plaintiff's difficulties were about to become exacerbated under Defendant Irwin's command.

83.     Irwin, acting as an agent of Defendant, City of Birmingham, acted under color of state law when he engaged in unlawful conduct against the Plaintiff. He also conducted himself as alleged herein for personal reasons, all in violation of the applicable law and regulatory authority cited herein.

84.     Irwin's actions constituted governmental action.

85.     Irwin acted in both his official and individual capacities in violating Plaintiffs' rights, privileges and immunities.

86.     Irwin is no longer employed by the Birmingham Police Department, having retired and accepted employment as Chief of Police of Pell City, Alabama. However, Plaintiff continues to suffer from the effects of the wrongful personnel and other actions taken against her by Irwin, as is more fully set forth herein.

87.     By the time Plaintiff was assigned to the West Precinct, she was the mother of two young boys, one of them the infant son of former Chief Deputy Tubbs. Tubbs had long been absent from the Plaintiff's life, and Plaintiff was raising her young boys as a single mother.

88.     Plaintiff repeatedly sought an accommodation from Captain Irwin in order that she could care effectively and adequately for her young children, an accommodation that had been granted, in accordance Procedure No. 202-13 and Procedure No.100-4 §II(b)(2), liberally to similarly situated employees who had not (1) refused to release the

City of Birmingham from all liability for its prior wrongful actions; (2) who had not engaged in an inter-racial relationship; (3) who had not given birth to a bi-racial baby; (4) who had not been associated with the dismissal of a popular Deputy Chief; (5) who had not been witness or privy to significant irregularities within Bell's office, and (6) who had not been the subject of inappropriate gossip, rumor or "scuttlebutt".

89.     These similarly situated employees who were accommodated pursuant to Procedures Nos. 202-13 and 100-4 §II(b)(2) included: Sgt. Tashara Ridley, Sgt. Theresa Colston, Sgt. Angela Bishop, Officer Shandria Lawrence, Officer Antonio Washington, Sgt. Charles Newfield and Sgt. Rebecca Herren, each of whom had received an accommodation longer than the six weeks accorded the Plaintiff.  On November 20, 2017, Plaintiff, through her attorney (because no one with the City Personnel Office would meet with her), notified the City Personnel office of this disparate treatment.

90.     Some of the rumormongering regarding the Plaintiff originated with Jerry Wiley, a captain who reported at one time to Tubbs and to whom Plaintiff reported while working in Bell's office.  As Wiley approached retirement, he informed Sgt. Carl Walker, Retired Captain James Blanton and others in the West Precinct in a position to overhear such gossip.  Wiley stated that he had informed Chief A.C. Roper that since Tubbs and the Plaintiff had been seeing each other, Wiley had been doing all Tubbs' work and suggested that Chief Roper make him Deputy Chief prior to Wiley's retirement.  Tubbs was Wiley's superior at the time and Wiley's conduct constituted an act of insubordination within the meaning of Procedure No. 110-2 and violated Procedure No. 109(3)(XIII).  Wiley was not disciplined for attempting to undermine his superior officer nor for engaging in rank

gossip in violation of clearly established rules and regulations of the Birmingham Police Department.

91.    On information and belief the rumor and gossip about the Plaintiff originated within Police Headquarters.  Stories about her and Tubbs were widely disseminated, but her exoneration by IAD regarding the September 2014 investigation and her substantial exoneration regarding the January 2, 2015 incident received little attention by gossipmongers within the department.

92.    Plaintiff was never informed that she had been so exonerated nor that she had been found to have committed acts unbecoming an officer in accordance with Procedure No. 110-1(IX)(B), until the City provided such documents to the E.E.O.C. in its defense of Plaintiff's charge of discrimination, and a Notice of Right to Sue was issued, at which time she obtained her official file material and made the discovery.

93.    It was also at that time that she learned that the City of Birmingham had disclosed portions of IAD investigative reports to the E.E.O.C. regarding the January 2, 2015 incident, reports which the City Attorney's Office, IAD and Attorney Matt Beam (on instruction from the City) have denied Plaintiff and her counsel prior to the filing of this action.

94.    Plaintiff has not been accorded the opportunity to review her AID file in a timely fashion, and does not believe that Chief Roper signed any order authorizing IAD to disclose the contents of her file(s) to the City's Law Department or to the E.E.O.C. under Procedure No. 110-1(XIII).

24

95.    Therefore, Plaintiff was not in a position to defend herself against the rumors and gossip so prevalent in the Department, about which she was largely unaware and was kept in the dark about Attorney Beam's and the IAD investigations' conclusions.

96.    In fact, it was not until she attempted to access her IAD files on May 18, 2017 that she learned that IAD is possessed of an "Information File" dated January 17, 2015 and that her case had been "Administratively closed, action/discipline completed" on June 13, 2016.

97.    On or about the 18th day of November, 2015, Irwin suggested that the Plaintiff voluntarily "roll-back" from the rank of Sergeant, which she had earned, to that of officer in order that she might receive the same treatment as other police officers and supervisors had traditionally received.  This suggestion constituted a disciplinary action which should have been reported to Chief Roper.  See, Procedure No. 100-4(II)(d)1), (F).  She reported this incident to Debra Crook, the City Personnel Director at the time.  Plaintiff refused to accept the demotion suggested by Irwin.

98.    Following this exchange with Irwin, and fearing continued mistreatment by Irwin and his superiors in the Police Department, Plaintiff applied for police officer positions with other municipalities and corporations; specifically, Fultondale Police Department in August 2016, Irondale Police Department in September 2016, Wells Fargo in 2016 and 2017, Helena Police Department in January of 2017, and Andy Frain Security, in 2016.  Except for a single interview with a Sergeant in Helena, none of her applications received any official attention of which Plaintiff is aware.  Plaintiff believes that the absence of responses to her applications were a direct and proximate consequence of her having been disparaged and defamed by officials of the City of Birmingham, whether

before or during her application processes, the concomitant result being the constitutional deprivations alleged in Count VI hereof.

99.     Chief Roper at various times appeared to try to assist the Plaintiff, suggesting that she attempt to locate another Sergeant with whom she could "swap", and she followed Chief Roper's direction on December 21, 2015 in an email to Chief Roper, on February 17, 2016 in an email to Irwin, which were improperly denied.  Plaintiff's attempts to exhaust any administrative remedies available to her are set forth in her Supplemental charge filed January 19, 2016 and attached hereto as Exhibit "C".

100.    Yet, Plaintiff was not without important allies who understood the inherent unfairness in Irwin's and others' refusal to entertain her request for a shift or scheduling accommodation.  For example, hiring Sergeant Otis Luke believed Irwin's actions were unfair and, on information and belief, contacted Lt. Anja Doyle about the matter.   Lt. Doyle agreed, and tried to get Chief Roper's ear regarding Plaintiff's treatment.  On information and belief, she reported the unfairness that violated Procedure No. 100-4(II)(b)(2) and Procedure No. 202-13 to Chief Roper's Administrative Assistant, Theophilus Smith.

101.    On information and belief, at least one of Plaintiff's supervisors then expressed glee that Plaintiff might be required to accept a demotion in order properly to care for and minister to her young children.  Because she fears that the source of this information might be subject to retaliation, she elects not to disclose the source's name or rank.

102.    Thereafter, her requests for accommodation, her reports of racial unrest and other matters occurring within the West Precinct were ignored by Captain Irwin, in

violation of Procedure No. 100-4(II)(F) and Procedure No. 100-4(VI)(D)(1). Other reports required by her position as supervisor were not forwarded to the appropriate authorities by Irwin, thereby violating the same procedures. These inactions on Irwin's part diminished the Plaintiff's standing in the Police Department and caused her worry and concern.

103.    Plaintiff began to feel she was working in a hostile working environment as a result of her pleas for assistance from her superiors and the other incidents related herein.  When she alleged she was being subjected to a hostile working environment in an official complaint filed pursuant to Procedure No. 109-25(I)(B), she was transferred to South Precinct temporarily as per established policy, and Chief Roper withdrew substantially from the matter.

104.    She was returned to West Precinct, to the hostile working environment about which she had complained, six weeks thereafter, in violation of established policy. (Procedure No. 109-25(II)(D)(5),(8)).

105.    Nevertheless, Plaintiff met with Chief Roper and Captain Theophilus Smith in May 2016, during which meeting she informed Chief Roper and Captain Smith of her post-partum complications and referred the two superior officials to her department-assigned counsellor for confirmation of her condition.

106.    On information and belief, neither Chief Roper nor Captain Smith nor any other official affiliated with the City of Birmingham took her concerns seriously or followed up on her representations relative to her physical and emotional conditions.

107.    Among the difficulties she experienced, one of them included continuing omissions of the Plaintiff from the supervisor's email list, resulting in her being out of the

official loop in connection with important information regarding the daily operations of the West Precinct.   This circumstance violated Procedure No. 107-2(II)(C).  In so doing or omitting to do, Captain Irwin and his superiors repeatedly violated the provisions of Procedure No. 100-4 (I)(C) of the Birmingham Police Department.  Although the Plaintiff complained about her omission from regular reports by her administration, she was deprived of information necessary to do her job efficiently and effectively as required by Procedure No. 100-2(II)(G).

108.    In one such instance, Plaintiff was caused to encounter a dangerous and potentially life-threatening situation involving an armed woman who was ultimately committed to Hillcrest Hospital for approximately a year.  Although other supervisors in the West Precinct had been informed about the subject, who was mentally disturbed and carried a loaded pistol, Plaintiff was not, and had to encounter her on more than one occasion, ignorant of the information other supervisors had been provided.

109.    Because of the absence of communication from her superiors, and especially Captain Paul Irwin, she was deprived of information necessary to the proper performance of her duties, undermined her authority with those who reported to her, and diminished her stature as a supervisor in the West Precinct.

110.    The Plaintiff complained on several occasions, but the problem was not remedied by her superiors, and she suffered loss of dignity and supervisory effectiveness as a result.  It has taken a great deal of time and effort on the part of the Plaintiff to attempt to regain the standing the actions of Irwin, the other Defendants and various non-defendant actors diminished by their misconduct.

COUNT I

PLAINTIFF'S TITLE VII CLAIM OF RACIAL DISCRIMINATION

111.   Plaintiff avers that she was treated differently and less favorably than similarly situated employees who were not involved in a mixed-race relationship or who had not conceived and given birth to a bi-racial baby.

112.   Plaintiff further avers that she was discriminated against and treated less favorably that other employees of the Defendant because she had the temerity to fall in love with a white supervisory police officer while in the employ of the Defendant.

113.   On the basis of the Plaintiff's race and that of her baby's father, Plaintiff was treated less favorably than any other employee of the Birmingham Police Department of whom she is aware.

114.   Prior instances of romantic relationships between employees who were not involved in such relationships were not treated in the deplorable fashion that Plaintiff was treated because of her race.

115.   The races of the Plaintiff and her partner and future fiancé was a major or determining factor in the Defendants' decision to deny her legitimate request for accommodation liberally granted to other employees, which rationale violates the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.

116.   Defendant, its agents, servants and/or employees, by their conduct herein alleged, intentionally, willfully and without justification, deprived the Plaintiff of rights, privileges and immunities secured to her by the laws of the United States, particularly her

right to be free from racial discrimination in the workplace as prohibited and governed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.

COUNT II

PLAINTIFF'S TITLE VII CLAIM OF PREGNANCY DISCRIMINATION

117.    Plaintiff avers that she was treated differently and less favorably than similarly situated employees of the Defendant who were not pregnant, and that her pregnancy status, considered in light of the race of the father, resulted in the Defendants' intentional discrimination against her as to the terms and conditions of her employment.

118.    Additionally, Plaintiff suffered from post-partum complications clearly documented by her department-appointed counsellor, facts that were made known to Chief Roper and other administrative officials within the Birmingham Police Department.

119.    Plaintiff's status as a woman pregnant with a white supervisor's mixed-race fetus, and her post-partum complications, were major or determining factors in the Defendants' decision to transfer her out of Bell's office, which rationale violates the provisions of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq.

120.    Defendants, their agents, servants and/or employees, by their conduct herein alleged, intentionally, willfully and without justification, deprived Plaintiff of rights, privileges and immunities secured to her by the Constitution and laws of the United States, particularly her right to be free from discrimination in the workplace on the basis of pregnancy and complications arising therefrom, which is prohibited and governed by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000e, et seq. *See, Young v. United Parcel Service, Inc.*, 575 U.S. ___, 135 S.Ct. 1338, 1344 (2015).

30

COUNT III

PLAINTIFF'S RACIALLY AND SEXUALLY HOSTILE WORKING ENVIRONMENT

CLAIM – TITLE VII

121.    Plaintiff avers that the Defendants discriminated against her and harassed her during her employment on the basis of her race, black, and gender, female, in that:

a.    Plaintiff's supervisor, Defendant Irwin, evidenced a racial animus toward the Plaintiff and other black employees.

b.    Irwin was, on information and belief, disciplined on more than one occasion for using the "N" word over his police radio.

c.    Irwin routinely created an atmosphere of racial and gender-based hostility in his disposition or assignment of emoluments of employment, including opportunities which were made available to officers who had not interacted legitimately with her superiors as had the Plaintiff, but which were repeatedly denied her without justification;

d.    Defendants and supervisory personnel, by indifference and inaction with regard to Plaintiff's complaints of discriminatory treatment and being subjected to a hostile working environment, nurtured and promoted a racially and sexually hostile working environment which Plaintiff was required to endure;

e.    While assigned the Bell's office, Harris denied the Plaintiff salary and overtime benefits based upon her race, gender, and in retaliation for her rejection of his overtures, her being a black female officer who refused to sign the release proffered, and his perception that she was not a "team player".

122.   Defendant Bell retaliated against the Plaintiff for the reasons outlined herein.   He failed to restore her to his security detail after the IAD investigation substantially exonerated her as stated above.  Harris likewise failed or refused to restore her to Bell's security detail.

123.   The reasons proffered by these officials, if any, were illegitimate and pretextual.

124.   When the Plaintiff filed formal complaints up the chain of command about the circumstances and events described in ¶¶ "a" through "e" above, her complaints fell on deaf ears.

125.   Plaintiff, by being subjected to the intimidating, hostile, and offensive atmosphere created by Defendants, was unreasonably affected in a "term, condition or privilege" of her employment as envisioned by 42 U.S.C. §2000e, et seq., and as amended by the Civil Rights Act of 1991, in that: (a) her physical and psychological well-being was adversely affected; and (b) she was denied benefits and other emoluments of employment granted other officers.

COUNT IV

PLAINTIFF'S RETALIATION CLAIMS

126.   At various times Plaintiff, made known to her supervisors certain objections she had to policies, practices, procedures, customs or usages of the Birmingham Police Department pursuant to, or in violation of which, she had been subjected.

127.   Plaintiff believes such conduct contributed to a hostile working environment that developed with respect to her employment in the city's West Precinct.

32

128. Plaintiff suffered arbitrary and capricious decision-making by her superiors in retaliation for the personal history set forth above in the Statement of Facts and because she was witness or privy to various instances of misconduct of elected or appointed public officials of the City of Birmingham.

129. Plaintiff was repeatedly denied accommodations on account of her race, gender, personnel history and opposition to the Defendants' discriminatory practices.

130. Plaintiff was subject to retaliation for having filed a charge of discrimination on March 31, 2015, a Supplement thereto on January 19, 2016 and a hostile working environment claim against her superiors, which was wrongfully denied by the Jefferson County Personnel Board on the basis of untimeliness.

131. Plaintiff was denied the accommodations she requested, and was denigrated privately and publicly by members of the Birmingham Police Department in retaliation for her having raised legitimate concerns regarding the discrimination against her that was violative of established practices, policies, procedures, customs or usages.

COUNT V

DEPRIVATION OF PLAINTIFF'S RIGHTS UNDER COLOR OF LAW,

42 U.S.C. SECTION 1983

132. Plaintiff and Defendants are persons within the meaning of 42 U.S.C. § 1983.

133. Defendant, City of Birmingham, is a political subdivision of the State of Alabama. Irwin, acting as an agent of Defendant Birmingham, acted under color of state law when he engaged in unlawful conduct against Plaintiff.

134.   Harris, as the Bell's security chief, acted as an agent of the City of Birmingham when he engaged in unlawful conduct against the Plaintiff.

135.   Bell is an elected public official serving as such as Mayor of the City of Birmingham.

136.   Irwin's, Harris' and Bell's actions constituted government action.

137.   Irwin, Harris and Bell acted in both their official and individual capacities in violating Plaintiffs' rights, although they employed different methodologies.

<u>Deprivation of Property Without Due Process of Law</u>

138.   Defendants Irwin, Harris and Bell intentionally, willfully and maliciously deprived the Plaintiff of certain emoluments of her employment outlined above, a property interest protected by the Fourteenth Amendment to the United States Constitution and made actionable by 42 U.S.C. §§1981 and 1983.

139.   They did so without due process of law and in violation of the equal protection of the laws.

140.   The absence of any semblance of due process has been set forth hereinabove.  The City's investigation of the Plaintiff by outside counsel Matt Beam, approved and orchestrated by Bell and his subordinates, was a sham calculated to instill fear, to threaten and to intimidate the Plaintiff and bore no resemblance to a hearing before a fair and impartial tribunal.  Contrary to the stated purpose of the assignment of the matter to Beam, there was no mediation session, and Beam's sole involvement was calculated to obtain the parties release of the city from liability.

141.   Throughout these sad processes, the officials involved merely pretended to the Plaintiff that they were interested in a fundamentally fair resolution of the issues

presented.  In fact, they were playing a shell game with the truth, with due process of law, and with the Plaintiff's future and livelihood and that of her family.

142.    As to the Beam "mediation" Plaintiff was provided with no notice of or report of any "hearing" nor any conclusion of any investigation conducted by Beam, the Defendants, Harris and Bell having ultimately determined to ignore Plaintiff's clearly established rights according to official rules and regulations and in violation of 42 U.S.C. §1983.

143.    As to the IAD investigation, Harris and Bell provided Plaintiff with no notice of or report of any "hearing" nor any conclusion of any investigation conducted by IAD, the Defendants, Harris and Bell having ultimately determined to ignore Plaintiff's clearly established rights according to official rules and regulations and in violation of 42 U.S.C. §1983 by suspending, reassigning and ultimately transferring her.

144.    In making this allegation, Plaintiff avers that the City has taken the position that the Plaintiff reported to Harris and the Office of the Mayor in connection with her duties, ignoring the actual reporting structure of the Birmingham Police Department.

145.    Defendants, Bell, Harris and Irwin, their agents, servants and/or employees, by their conduct herein alleged, intentionally, willfully and without justification, deprived Plaintiff of rights, privileges and immunities secured to her by the laws of the United States, particularly her right to due process prior to the deprivation of the emoluments of her property interest in public employment as alleged hereinabove, which unconstitutional deprivations are made actionable by 42 U.S.C. §1983, and subject to redress in this Honorable Court.

146.    The unconstitutional deprivations of property by Defendant Herman Harris by denying her overtime opportunities equal to those of her male counterparts were effectuated without due process of law and resulted in significant pecuniary loss to Plaintiff.

147.    Plaintiff likewise avers that she was denied the equal protection of the laws by each of the Defendants on several occasions as set forth above.

Deprivation of Liberty Interest, Stigmatization, Without Due Process of Law

148.    Plaintiff avers that she made no disclosures to any person other than IAD or her superior officers regarding the nature of the circumstances surrounding the September 2014 and January 2, 2015 incidents that gave rise to the Beam and IAD investigations respectively.

149.    Apparently, Tubbs, while serving in the capacity of Deputy Chief of Police, did make disparaging statements to individuals within the police department regarding the Plaintiff and was found to have engaged in conduct unbecoming an officer as a result thereof.

150.    Plaintiff only discovered such facts when she obtained her E.E.O.C. file following the issuance of her Notice of Right to Sue on February 22, 2017.  The nature of the findings of Beam and IAD were intentionally kept from her in violation of official policy, and she was injured thereby.  She was not notified of Tubbs' disparagement until long after the City became aware of it, was not accorded the name-clearing hearing she had requested, and the gossip and rumors that had been permitted by City officials, and proliferated overtly and by their silence and secrecy, were caused to fester and further damaged the Plaintiff's good name and reputation.

151.    Plaintiff avers that other officials of the City of Birmingham, both appointed and elected, made disclosures of the allegations that gave rise to the two investigations aforementioned, as well as conjecture or opinion relative to the same.

152.    As a result of the improper and unauthorized disclosures by such officials, which were false and misleading, Plaintiff was caused to suffer defamation of her character and was stigmatized, which resulted in damage to her reputation and to her loss of future employment opportunities.

153.    Specifically, as stated above, Captains in charge of all four of Birmingham's precincts were informed, via official channels, of conjecture and opinion that falsely disparaged the Plaintiff by the selective disclosure of the contents of investigative information generated during the Beam and IAD investigations of the Plaintiff and former Chief Deputy Tubbs.

154.    As a result, and in violation of applicable policy and procedure, Plaintiff was denied rights, privileges and immunities enjoyed by other police officers.

155.    Plaintiff was caused to suffer the deprivation of liberty without due process of law in connection with the malicious damage to her good name and reputation and, thereafter, in the terms and conditions of her employment with the City of Birmingham, as set forth above.

156.    The Plaintiff has faced unwarranted difficulty in finding new employment and lost future job responsibilities as result of the disparagement and defamatory actions of the Defendants as is set forth above in ¶98.

## COUNT VII
### RACE AND COLOR DISCRIMINATION – 42 U.S.C. §1981-

Disparate Treatment Discrimination, Harassment and Retaliation

157.    Defendants' treatment of Plaintiff constitutes disparate treatment, harassment, and retaliation.

158.    Defendants denied her opportunities based upon her race, color, gender and on the basis of her having delivered of a bi-racial baby and her relationship with a white supervisor. Such treatment denied her the opportunity for advancement in employment, and other rights, privileges and conditions of employment.

159.    Plaintiff made timely reports to Defendant City of Birmingham and to supervisory individuals within her chain of command of these unlawful actions, including Defendant Irwin.

160.    The actions of the Defendants subjected Plaintiff to discrimination, harassment and retaliation because of her race, color, and gender within the meaning of 42 U.S.C. §1981, and Defendants' actions, therefore, constitute unfair employment practices against Plaintiff, for which they are liable in damages to her.

161.    As a result of these intentional acts of discrimination, Plaintiff has been harmed and has lost salary, overtime and other benefits, has been denied employment opportunities and advancement, present and future, and has suffered and will continue to suffer emotional pain and anguish, and compensatory and punitive damages in an amount in excess of $75,000.

## COUNT VIII

VIOLATION OF PLAINTIFF'S RIGHT TO EQUAL PROTECTION OF THE LAWS –

42 U.S.C.  § 1983

162.    Defendant, City of Birmingham, is a public employer and receives monetary funding from public sources.

163.    Plaintiff is an employee of the Birmingham Police Department and, therefore, enjoys rights, privileges and conditions of employment which include being free of harassment, discrimination and retaliation based upon her race and color, gender, pregnancy, and assertion of legitimate rights guaranteed her by the rules and regulations of the City of Birmingham and the 14th Amendment to the Constitution of the United States.

164.    Defendants subjected the Plaintiff to harassment, discrimination and retaliation based upon her race, color, gender and other illegitimate factors hereinabove set forth.

165.    Defendants had no legitimate or rational bases for subjecting her to harassment, discrimination or retaliation based upon her race, color, gender, pregnancy status or her attempts to secure for herself the rights guaranteed her by the official policies, practices, rules, regulations and procedures of the Birmingham Police Department and the 14th Amendment to the Constitution of the United States.

166.    The purpose and effect of the unlawful policies and practices of Defendants was to deprive Plaintiff, under color of state law, statute, regulation, custom and usage, of rights, privileges, and immunities secured to her by the Fourteenth Amendment to the Constitution of the United States providing for Equal Protection for all citizens and all other persons within the jurisdiction of the United States and made actionable pursuant to 42 U.S.C. §1983.

167.    As a result of the unconstitutional actions of Defendants, and each of them, jointly and severally, as set forth in the above statement of facts, Plaintiff has been harmed, has lost salary and benefits, has been denied employment opportunities and

advancement, and has suffered and will continue to suffer mental and emotional pain, distress and anguish, for which she is entitled to compensatory and punitive damages in an amount in excess of $75,000.

## COUNT IX

## INTENTIONAL INFLICTION OF MENTAL ANGUISH AND EMOTIONAL DISTRESS UNDER THE COMMON LAW OF THE STATE OF ALABAMA

168.    Plaintiff avers that Defendant Bell treated the Plaintiff differently than similarly situated male employees.

169.    In October, 2015 Bell verbally and vulgarly abused the Plaintiff under the circumstances as set forth hereinabove.

170.    Bell directed the Plaintiff's activities while in his service as a security officer, her overtime assignments, her suspension, her placement on Administrative Leave, her forfeiture of her credentials, the irregularities associated with the Beam and IAD investigations of her, yet he failed to take any appropriate action to correct these circumstances and failed to restore her to his security staff following the IAD investigation and all that flowed from it.

171.    Irwin had been made fully aware of Plaintiff's physical and emotional difficulties following the birth of her baby in July, 2015 and of Plaintiff's bona fide need for an accommodation, yet afforded her only a six week reassignment, subjecting her to disparate treatment thereby.

172.    Irwin attempted to induce Plaintiff to accept a reduction in a rank and salary she had earned in exchange for according her the accommodation liberally granted to other employees.

40

173.    Irwin failed to keep Plaintiff informed of reports and memoranda vital to her job performance, thereby undermining her effectiveness and placing her in a disadvantaged position relative to officers who reported to her.

174.    In one instance, Plaintiff was placed in life-threatening situation as set forth in ¶¶107-108 above.

175.    Irwin ignored and/or failed to forward official memoranda and complaints filed by the Plaintiff in accordance with applicable rules and regulations.

176.    Plaintiff was greatly disturbed by the actions or omissions to act by Irwin and felt her employment, health and reputation were being jeopardized by the same.

177.    Herman Harris sexually harassed the Plaintiff beginning in August 2014 and, when she rebuffed his advances, began to deprive her of valuable employment opportunities on the basis of her gender, including overtime and other emoluments of her employment.

178.    Plaintiff was upset and suffered mental anguish and emotional distress as a result of the intentional actions or omissions to act by Harris.

179.    Plaintiff was greatly disturbed by the actions or omissions to act by Harris and believes that her employment, health and reputation were jeopardized by the same.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against all Defendants, and each of them, jointly and severally, for all remedies and damages to which she may be entitled to receive, including, but not limited to:

A.    That the actions and practices of the Defendants complained of herein be adjudged, decreed and declared to constitute deprivations of the rights secured to the Plaintiffs by the

Constitution of the United States, 42 U.S.C. §2000e, et seq., 42 U.S.C. §1983 and 42 U.S.C. §1981, and the common law of the State of Alabama.

B.      That a permanent mandatory injunction be issued requiring that Defendants adopt and comply with practices in conformity with their own Rules, Regulations and Procedures, the requirements of the Constitution of the United States, 42 U.S.C. § 2000e, et seq., 42 U.S.C. §1983 and 42 U.S.C. §1981.

C.      That a permanent prohibitory injunction be issued prohibiting Defendants from engaging in the practices complained of herein.

D.       That the Court will enter an Order enjoining Defendants and their officers, agents and employees from subjecting Plaintiff and similarly situated individuals to differential treatment, and from any retaliation against Plaintiff and similarly situated individuals for prior actions, or for bringing this action.

E.      That the Court retain jurisdiction until such time as the Court is satisfied that the Defendants have remedied the practices complained of herein and are determined to be in full compliance with the Orders of this Honorable Court and have permanently remedied the practices of which Plaintiff complains herein.

F.      That this Court will award compensatory damages including, but not limited to, mental anguish, loss of dignity and other intangible injuries;

G.      That this Court will award the Plaintiff punitive damages;

H.      That this Court will award reasonable attorney's fees and all costs incurred herein;

I.      That this Court will award all other legal and equitable damages or remedies to which Plaintiffs may be entitled, the premises considered.

PLAINTIFFS DEMAND TRIAL BY STRUCK JURY ON ALL ISSUES TRIABLE

THEREBY

Kesha LaShawn Bogus,
Plaintiff

George Huddleston III
(asb-3863-h71g)
Attorney for Plaintiff
2629 Dolly Ridge Road
Birmingham, Alabama 35243
(205)563-2900
hooaah@bellsouth.net

Service Information:
See summonses attached hereto,
which will be served by the Plaintiff
together with a copy of the Complaint
and Exhibits.