UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| KESHA LASHAWN BOGUS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:17-cv-827-GMB |
| | ) | |
| CITY OF BIRMINGHAM, | ) | |
| ALABAMA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## **MEMORANDUM OPINION AND ORDER**

Pursuant to 28 U.S.C. § 636(c), the parties have consented to the jurisdiction of a United States Magistrate Judge.  Pending before the court is the Motion for Summary Judgment filed by defendants the City of Birmingham, William A. Bell Sr., Paul Irwin, and Herman Harris. Doc. 110.  Plaintiff Kesha LaShawn Bogus has filed a response in opposition to the motion (Doc. 120), and the defendants have filed a reply brief in support. Doc. 127.  Also pending is a Supplemental Motion to Compel (Doc. 121) filed by Bogus.  After careful consideration of the parties' submissions and the applicable law, and for the reasons that follow, the court concludes that the Supplemental Motion to Compel is due to be denied, and that Motion for Summary Judgment is due to be granted.

## **I.  JURISDICTION AND VENUE**

The court has jurisdiction over the claims in this lawsuit pursuant to 28 U.S.C.

§ 1332. The parties do not contest personal jurisdiction, nor do they contest that venue is proper in the Northern District of Alabama. The court finds adequate allegations to support the propriety of both.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff Kesha LaShawn Bogus filed suit on May 19, 2017, asserting a number of claims arising out of her employment with the City of Birmingham, Alabama (the "City") as a police officer. Doc. 1. On June 20, 2017, the defendants filed a motion to dismiss or, in the alternative, a motion for more definite statement. Doc. 10. On April 11, 2018, the court granted in part and denied in part the defendants' motion, dismissing a number of claims and finding that Bogus had viable claims remaining under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and 42 U.S.C. § 1983. Doc. 32 at 43–44.

The Birmingham Police Department ("BPD") hired Bogus as a police officer in 1996. Doc. 112-1 at 26. Bogus, who is a black woman, was assigned to the security detail for Mayor William A. Bell in 2012. Docs. 112-1 at 26 & 112-8 at 3. Bogus was one of four officers assigned to the security detail, all of whom rotated daily between working directly for the Mayor, for the Mayor's office, or on other tasks. Doc. 112-8 at 2. Sergeant Herman Harris, a black man, was responsible for scheduling the officers on Mayor Bell's security detail. Doc. 112-8 at 2. Bogus claims that before August 2014 Sergeant Harris made unwanted romantic advances

toward her in person and by text message. Doc. 112-1 at 8 & 42. Harris denies that he made any sexual advances or comments of a sexual nature. Doc. 112-8 at 6.

Bogus claims that in 2014 and earlier she did not have as many opportunities to work overtime as her coworkers in the Mayor's security detail because of her gender, her interracial romantic relationship, and complaints she made about Harris' behavior. Doc. 112-1 at 7 & 10–11. In 2014 and 2015, two of Bogus' fellow officers worked more overtime hours than she did, and two worked less. Doc. 112-5 at 2–3. Jeffrey Whitt and Eric Smith, both of whom are black men, worked 1,704.86 and 1,871.78 overtime hours, respectively. Doc. 112-5 at 3. Bogus worked 1,124.73 overtime hours. Doc. 112-5 at 2. Kareem Easley and Marcel Walker, who also are both black men, worked 326.91 and 933.26 overtime hours, respectively. Doc. 112-5 at 2. On several occasions, Bogus was offered opportunities to work overtime but declined to do so. Doc. 112-8 at 6.

On October 9, 2014, Bogus emailed Harris explaining that she had been excluded from the schedule for providing security at Mayor Bell's home while he was on vacation from September 14, 2014 to September 29, 2014. Doc. 112-8 at 4–5 & 10–13. In an email response, Harris apologized for Bogus' omission from the schedule, which he characterized as an "oversight," and he told Bogus that he would use a sign-up sheet for special assignments in the future to make sure that the mistake did not occur again. Doc. 112-8 at 12. When Bogus replied to Harris on October 9,

2014, she complained about conversations she had with him on October 2, October 8, and October 10, and told him that she thought he was attempting to "to pay [her] back for some reason or another." Doc. 112-8 at 11. This email was Bogus' first complaint to Harris about any assignment or the amount of c offered to her. Doc. 112-8 at 4.

Bogus claims that Mayor Bell fostered a sexually hostile work environment by permitting Harris to manage his security detail. Doc. 112-1 at 8. Specifically, Bogus alleges that Harris called her "more often than he should" and that he sent text messages to her and made "other unwanted gestures" sometime before the summer of 2014. Doc. 112-1 at 8. Bogus could not identify any specific calls, text messages, or gestures that made her uncomfortable or that she felt were sexually harassing. Doc. 112-1 at 42. Bogus testified that she never reported Harris' conduct and that she "still worked" despite his conduct. Doc. 112-1 at 42.

In 2013, Bogus commenced a romantic relationship with her supervisor, Ray Tubbs, a deputy chief who is white. Docs. 112-1 at 7 & 112-2 at 70. Just over one year later, in September 2014, April Odom, the City's Director of Communications, reported to Chief of Police AC Roper that she witnessed an argument between Bogus and Tubbs outside of a restaurant. Docs. 112-8 at 3 & 112-7 at 3. Afterword, the City of Birmingham retained an attorney, Matt Beam, to investigate the incident and inquire into the relationship between Bogus, Tubbs, and Odom. Doc. 112-11 at 1.

Odom worked for the City and had no affiliation with BPD. Docs. 112-7 at 3 & 112-8 at 4. Beam's investigation concluded that the altercation at the restaurant stemmed from the fact that Tubbs was carrying on relationships with Bogus and Odom at the same time. Doc. 112-11 at 2–3. The City asked Beam to "mediate the personal dispute between Officer Bogus, Deputy Chief Tubbs, and Ms. Odom and develop a plan for a resolution." Doc. 112-11 at 3. Beam did not speak with Mayor Bell during the investigation. Doc. 112-11 at 3.

Around October 2014, Bogus became pregnant with Tubbs' child. Doc. 112-1 at 30. She notified BPD of her pregnancy in January 2015. Doc. 112-1 at 30. On January 3, 2015, Tubbs filed a complaint against Bogus with BPD's Division of Inspections and Internal Affairs. Docs. 112-5 at 3 & 112-6 at 1. Tubbs alleged that on January 2 Bogus confronted him in his office about his purported relationship with Odom. Doc. 112-6 at 1. Bogus allegedly said that "she was going to f**k them up and kill [Tubbs]," she had "threatened to kill him several times over the [prior] several months," and "threatened to kill his daughter and ex-wife." Doc. 112-6 at 1. The complaint also alleged that Bogus sent Tubbs harassing emails and Facebook messages and went to his apartment uninvited late at night on multiple occasions. Doc. 112-6 at 1. BPD placed Bogus on paid administrative leave. Doc. 112-1 at 29. BPD's investigation concluded that Bogus had engaged in "conduct unbecoming [of] a police officer." Doc. 1 at 13.

On January 8, 2015, BPD reassigned Bogus from the Mayor's security detail to its Community Services Division. Doc. 112-5 at 3. While her role changed, her salary remained the same. Docs. 112-1 at 30 & 112-5 at 3. According to Harris and Mayor Bell, the decision to reassign Bogus was Chief Roper's alone. Docs. 112-7 at 4 & 112-8 at 5. Harris testified that he was not aware of Bogus' pregnancy until after she was transferred, and Mayor Bell did not learn about the pregnancy until Bogus' child was born in July 2015. Docs. 112-7 at 4 & 112-8 at 5. Bogus remained in the Community Services Division until taking maternity leave after giving birth in July 2015. Doc. 112-1 at 19 & 30–31. She stayed on maternity leave until October 2015. Doc. 112-1 at 32.

On October 3, 2015, BPD promoted Bogus to Sergeant and increased her pay. Doc. 112-1 at 32; Doc. 112-5 at 8–9; Doc. 112-9 at 3. Chief Roper and Mayor Bell both approved the promotion. Doc. 112-1 at 32; Doc. 112-5 at 8–9; Doc. 112-7 at 4. As a Sergeant, Bogus' responsibilities increased, and she now was responsible for the supervision of the police officers assigned to her shift. Docs. 112-9 at 8–9 & 112-10 at 5. BPD is divided into four precincts led by Captains, and at least once per year the Captains select which recently promoted Sergeants will work in their precincts. Docs. 112-9 at 1 & 112-10 at 2. The selection process is determined by seniority, with the senior-most Captain picking first. Docs. 112-9 at 2 & 112-10 at 1. Paul Irwin selected Bogus to work as a Sergeant in the West Precinct, which is

BPD's largest precinct. Doc. 112-9 at 1 & 3.

The West Precinct had one Lieutenant assigned to each shift (morning, day, and night), all of whom reported directly to Irwin. Doc. 112-9 at 1. Each shift had four Sergeants who reported to the Lieutenant assigned to their shift. Doc. 112-9 at 1. Shift assignments and days off at BPD are based primarily on seniority. Doc. 112-2 at 66. However, officers may state their preference for shift assignments and days off twice per year. Doc. 112-10 at 2–3. The senior-most Sergeant in each precinct gets the first choice to state his or her scheduling preferences. Doc. 112-10 at 2–3. In October 2015, Bogus had just been promoted and did not have seniority over any other West Precinct Sergeant—as a result, she was assigned the night shift from 3:00 p.m. to 11:00 p.m. Doc. 112-10 at 3–4.

On October 12, 2015, Bogus sent a memorandum to Irwin describing some of the challenges she had faced since her promotion to Sergeant. Docs. 112-1 at 160 & 112-9 at 3. Bogus explained that she is a single parent and would not be able to transport her children to and from daycare and to a babysitter if she worked the night shift. Doc. 112-1 at 160. She requested a meeting with Irwin to discuss temporary "accommodations that can be made temporarily or any other assignments as a sergeant at the West Precinct with more flexible hours." Doc. 112-1 at 160. Irwin met with Bogus on October 15 and told her that BPD could provide her a temporary "personal hardship" accommodation for up to six weeks, which would allow Bogus

to work Monday through Friday from 8:30 a.m. to 5:00 p.m. Doc. 112-1 at 161. He also told Bogus that she would need to resume the night shift on November 30. Doc. 112-1 at 161. On November 9, Bogus sent a memorandum to Chief Roper requesting "to continue working this shift as it accommodates my family responsibilities." Doc. 112-1 at 163. However, Chief Roper did not approve Bogus' request because hardship accommodations are granted for no longer than six weeks, and Chief Roper determined that the request was not in the best interests of BPD and the community. Doc. 112-6 at 37; Doc. 112-9 at 3–5; Doc. 112-10 at 3. Specifically, granting Bogus' request for a permanent shift reassignment "would have meant that the night shift in the West Precinct would have been operating with three instead of four Sergeants." Doc. 112-9 at 4.

BPD policy states that officers may choose their shifts "by seniority, so long as the interest of [BPD] is kept foremost." Doc. 112-2 at 66. If BPD's interests conflict with an officer's desired shift, the officer must provide an "acceptable reason for not being transferred," which could include "school," "personal hardship," or "unique circumstances." Doc. 112-2 at 66. The policy does not define "personal hardship." According to Irwin and Hatcher, it is not in BPD's best interest to permit every officer to work his or her desired shift, "as some shifts would inevitably be left understaffed to the detriment of the community." Docs. 112-9 at 2 & 112-10 at 3. Further, Irwin and Hatcher testified in their declarations that it is

easier for BPD to grant temporary shift accommodations to police officers than to Sergeants "because Sergeants have supervisory responsibilities that police officers do not have." Docs. 112-9 at 5 & 112-10 at 5. Irwin is not aware of any Sergeant other than Bogus who received a temporary shift accommodation. Doc. 112-10 at 5.

Irwin and Chief Roper suggested that Bogus could ask other Sergeants if they would be willing to trade shifts with her. Docs. 112-6 at 37 & 112-9 at 5. Irwin also told Bogus that she could accept a demotion to a police officer position, where she would have seniority and could therefore choose her desired shifts and days off. Doc. 112-9 at 6. Instead, Bogus resumed working on the night shift after her temporary accommodation period ended on November 30, 2015. Doc. 112-1 at 49–50. On December 21, Bogus wrote Chief Roper that she believed the North Precinct needed a Sergeant for its morning shift. Doc. 112-6 at 34. Bogus offered to fill this shift as long as she could continue to have Saturdays and Sundays off. Doc. 112-6 at 34. Chief Roper did not approve the request because the North Precinct's vacancy was due to the temporary transfer of one of its Sergeants to the West Precinct pending an investigation. Doc. 112-6 at 20 & 40–41.

Late in December 2015, Chief Roper responded to Bogus. Doc. 112-6 at 36. He explained that scheduling preferences are based on seniority, encouraged her to find a Sergeant with whom to trade shifts, and suggested that she might be more likely to find a trading partner if she offered to trade shifts without requiring certain

days off. Doc. 112-6 at 36. Chief Roper then met with Bogus on January 21, 2016 and suggested that she speak with her precinct's Captain about switching shifts with another Sergeant in that precinct or a Sergeant in a different precinct. Doc. 112-6 at 37. Chief Roper then followed up with an email explaining to Bogus that it would be "very important" for her to find someone with whom to trade shifts because she is "assigned to the busiest shift in the busiest precinct." Doc. 112-6 at 37. He believed that Bogus should be able to find a trading partner because Bogus had abandoned her requirement to keep the same days off (Saturdays and Sundays). Doc. 112-6 at 37. However, through January and February 2016 Bogus was unable to find another Sergeant with whom she could switch shifts. Doc. 112-6 at 38–46.

On February 5, 2016, Bogus emailed Peggy Polk, the City's Director of Human Resources ("HR"), alleging that she had been subjected to a hostile work environment because Irwin and Chief Roper did not help her find a schedule that enabled her to properly care for her children. Doc. 112-6 at 47 & 50. HR investigated the complaint by interviewing witnesses, reviewing correspondence, and analyzing information on the shift assignments and responsibilities of other black female Sergeants in the West Precinct. Doc. 112-5 at 4. While the investigation was pending, Bogus received a temporary transfer to the South Precinct at her request. Doc. 112-5 at 4. The investigation concluded that Bogus had not been subjected to a hostile work environment or discrimination on the basis of her race, gender, or

interracial relationship. Docs. 112-5 at 5 & 112-6 at 10–11. Bogus therefore transferred back to the West Precinct in March 2016. Docs. 112-6 & 112-9 at 10.

After returning to the West Precinct, Bogus initially worked the night shift, but then transitioned to the morning shift (11:00 p.m. to 7:00 a.m.) on June 11, 2016. Doc. 112-5 at 16–18. Between March 4, 2017 and September 1, 2017, she was assigned to the day shift (7:00 a.m. to 3:00 p.m.), but returned to the morning shift from September to October 2017, was back on the day shift between October and November 2017, and has worked on the morning shift since November 25, 2017. Doc. 112-5 at 19–22.

Bogus claims that other officers were given shift accommodations while she was not. Docs. 112-1 at 13 & 112-6 at 5–7. Specifically, Bogus alleged during the HR investigation that Sergeants Angela Bishop, Teresa Colston, and Tashara Ridley were granted hardship accommodations that she was denied. Doc. 112-6 at 9. She also identified two police officers, Antonio Washington and Tiffany Calhoun, who received hardship accommodations. Doc. 112-6 at 9. However, Bishop and Colston did not request accommodations while they were Sergeants, and Ridley took a demotion to a police officer position after her hardship accommodation was not extended to the length she requested. Doc. 112-6 at 10; Doc. 112-9 at 8–9; Doc. 112-10 at 6. Police Officers Antonio Washington and Tiffany Calhoun, like Bogus, were each granted temporary hardship accommodations. Docs. 112-6 at 72–74 & 112-9

11

at 8–9.

Bogus also alleges that Irwin intentionally omitted her from a precinct-wide email list after her March 2016 transfer back to the West Precinct, preventing her from receiving "pertinent information to completely do [her] job." Doc. 112-1 at 11. She also claims that Irwin made "several different gestures" and "statements" toward her in staff meetings "[r]egarding seniority." Doc. 112-1 at 11 & 13. According to Irwin, he used a "preset" email list when emailing Sergeants within the West Precinct. Doc. 112-9 at 10. During Bogus' temporary transfer to the South Precinct in February 2016, she had been removed from the West Precinct email list. Doc. 112-9 at 10. When Bogus returned, Irwin attempted to add her back to the email list, but the "list did not properly update to include" Bogus "due to a technological mistake." Doc. 112-9 at 10–11. Irwin "immediately added" Bogus to the list once she told him that she was not receiving his emails. Doc. 112-9 at 11. Irwin explained that this was the only time he left Bogus off the distribution list, and that he "never intentionally excluded" Bogus from emails to West Precinct Sergeants. Doc. 112-9 at 11.

On March 31, 2015, Bogus filed her first charge of discrimination with the U.S. Equal Employment Opportunity Commission ("EEOC"). Doc. 3-1. In the charge, she alleged that she was removed from the Mayor's security detail because of her interracial relationship and ensuing pregnancy with a biracial child. Doc. 3-1

at 2.  She also alleged that she was subjected to a "hostile working environment."
Doc. 3-1 at 2.

On January 19, 2016, Bogus filed a second EEOC charge alleging that she was discriminated against, retaliated against, and subjected to a hostile work environment. Doc. 3-3 at 1–2.  In this charge, Bogus alleged that she was subjected to a hostile work environment because of her gender, race, and status as a single parent of a biracial child. Doc. 3-3 at 1–2.  She cited the denial of her request to permanently extend her hardship accommodation. Doc. 3-3 at 1.

Bogus filed suit in this court on May 19, 2017, asserting a number of claims arising out of her employment with BPD, including (1) Title VII race discrimination; (2) Title VII "pregnancy discrimination"; (3) Title VII hostile work environment; (4) Title VII retaliation; (5) 42 U.S.C. § 1983 deprivation of rights under color of law; (6) 42 U.S.C. § 1983 Fourteenth Amendment Due Process Clause violation; (7) 42 U.S.C. § 1981 race and color discrimination; (8) 42 U.S.C. § 1983 Equal Protection Clause violation; and a state-law claim for intentional infliction of emotional distress. Doc. 1.  On June 20, 2017, the defendants filed a motion to dismiss or, in the alternative, motion for more definite statement.  The court granted in part and denied in part the motion, identifying the following surviving claims:

(1)  Claims asserted under Title VII . . . against the City only, based on the following allegations:
   a.  Bell's and/or Harris's decision to deny the plaintiff the opportunity to earn overtime compensation.

b. Bell's and/or Harris's decision to transfer the plaintiff from the Mayor's security detail either because of her interracial relationship with Deputy Chief Tubbs or due to her pregnancy.

c. Bell's and/or Harris's creation of a sexually hostile work environment.

d. Bell's and/or Harris's retaliation against the plaintiff because she complained during the Beam investigation that Harris made unwanted romantic advances to her.

e. Harris's retaliation for plaintiff's complaint to him that she was being discriminatorily denied the opportunity to earn overtime.

f. Irwin's decision to deny Bogus a shift accommodation due to her prior interracial relationship with Tubbs and the birth of her bi-racial child.

g. Irwin's harassment and creation of a racially hostile work environment because of Bogus' race and prior interracial relationship with Tubbs.

h. Irwin's creation of a racially and sexually hostile work environment in retaliation for plaintiff having previously filed an EEOC charge.

(2) Claims under 42 U.S.C. § 1983 brought against Irwin in his individual capacity based on:

a. Irwin's retaliation against Bogus in violation of the First Amendment for reporting misconduct that she observed occurring within the City.

b. Irwin's decision to grant accommodations to other employees but not to Bogus in violation of the Fourteenth Amendment Equal Protection Clause.

c. Irwin's decision to exclude Bogus (1) from receiving reports and (2) from the supervisor's email list, while including all other supervisors, in violation of the Fourteenth Amendment Equal Protection Clause.

(3) Claims under 42 U.S.C. § 1981 of race discrimination in contract brought against the City, and Harris, Bell, and Irwin in their individual capacities.

Doc. 32 at 44–45. The defendants now move for summary judgment on all remaining claims. Doc. 111 at 4–5.

### III. STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute of material fact is genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine [dispute] of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). In responding to a properly supported motion for summary judgment, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Indeed, the nonmovant must "go beyond the pleadings" and submit admissible evidence demonstrating "specific facts showing that there is a genuine [dispute] for trial." *Celotex*, 477 U.S. at 324 (internal quotation marks omitted). If the evidence is "merely colorable, or

is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249 (citations omitted).

When a district court considers a motion for summary judgment, it "must view all the evidence and all factual inferences reasonably drawn from the evidence in the light most favorable to the nonmoving party, and must resolve all reasonable doubts about the facts in favor of the nonmovant." *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1274 (11th Cir. 2008) (citation and internal quotation marks omitted). The court's role is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." *Allen v. Bd. of Pub. Educ. for Bibb County*, 495 F.3d 1306, 1315 (11th Cir. 2007) (citation omitted). Importantly, if the nonmovant "fails to adduce evidence which would be sufficient . . . to support a jury finding for [the nonmovant], summary judgment may be granted." *Brooks v. Blue Cross & Blue Shield of Fla., Inc.*, 116 F.3d 1364, 1370 (11th Cir. 1997) (citation omitted).

## IV. DISCUSSION

### A. Motion to Compel

In her motion to compel, Bogus requests several categories of documents and

information relating to (1) other female officers who gave birth or adopted children, (2) other accommodation requests by male or female officers, (3) unspecified personnel files; (4) previous lawsuits and complaints involving BPD; and (5) other members of Mayor Bell's security detail. Doc. 121 at 4–10. For the following reasons, Bogus is not entitled to any additional discovery and her motion to compel is due to be denied.

First, Bogus has not shown why she was unable to file a motion to compel prior to the expiration of the deadline for discovery. The discovery deadline was extended to April 5, 2019, *see* Doc. 74, yet Bogus did not file her motion to compel until almost one month later, on May 2, 2019. Doc. 102. Because of several deficiencies in the motion, on May 30, 2019, the court directed Bogus to file a supplemental motion. Doc. 119. She did so on June 13, 2019. Doc. 121. But even Bogus' original motion was filed after the expiration of the discovery deadline and she has provided no justification for failing to file her motion in a timely fashion. Courts routinely deny motions to compel filed after the close of discovery. *See, e.g.*, *El-Saba v. Univ. of S. Ala.*, 738 F. App'x 640, 645 (11th Cir. 2018) (affirming the district court's denial of a motion to compel where "the motion was filed almost two weeks after the close of discovery and therefore was untimely").

Moreover, even if the court were to entertain Bogus' motion, it would be due to be denied on its merits. Bogus argues that "[d]ocuments relating to female officers

. . . who gave birth or adopted children are highly relevant to [her] allegations that [she] was subjected to discrimination," but she does not explain how these documents, even if in existence and recoverable by the City, are relevant to her suit, not overbroad, and not redundant of her other discovery requests. Doc. 121 at 4–5. Moreover, many of these documents would have limited relevance, if any, given that Bogus claims that she was discriminated against for having an interracial relationship and biracial child, and the request is not limited to women in interracial relationships and/or with biracial children. The defendants also have disclosed that they do not maintain records differentiating the employees who have given birth or adopted a child while working at BPD. Doc. 126 at 6. Thus, Bogus' request would force the defendants to "individually search the files of all female police officers who have taken leave in the last 10 years to determine if that individual took leave related to pregnancy." Doc. 126 at 6. Bogus has not demonstrated the relevance of this request, and it is overbroad and unduly burdensome to the City.

Next, Bogus seeks "[d]ocuments related to accommodation request[s] for any reason by male or female" employees. Doc. 121 at 6 & 19–20. Again, Bogus offers no explanation for why all accommodation requests by any male or female BPD officer would be relevant to her remaining claims. Again, this request is overly broad and unduly burdensome. Bogus references her alleged diagnosis "with postpartum depression after returning to work after giving birth to [her] biracial baby

and young son," but she has not made any claims in this lawsuit under the Americans with Disabilities Act for disability discrimination. Rather, she contends that other coworkers were treated more favorably because they were granted hardship accommodations while she was not, a claim for which there is already relevant evidence in the record. According to the defendants, the City does not maintain records of every employee who makes a hardship accommodation request, and it has already "searched for and . . . produced any potentially relevant, responsive documents that could be located regarding the shifts worked by [Bogus'] purported comparators." Doc. 126 at 8.

Bogus also requests "[d]ocuments relating to personnel files" to show that the defendants "had a pattern or practice of discriminatory [conduct] and violations of due process rights[.]" Doc. 121 at 7. This request is overbroad because Bogus does not explain which personnel files she seeks and for what purpose. In Bogus' requests for production, she requested personnel and Internal Affairs files for Irwin and Harris. Doc. 121 at 37. The City already has produced "documents related to any complaints of or training regarding harassment, discrimination, or retaliation for Mr. Harris and Mr. Irwin," but has not produced Internal Affairs or personnel files because it considers these records to be confidential. Doc. 126 at 9. Nevertheless, the defendants explain that the only documents in Harris' or Irwin's Internal Affairs or personnel files "that relate to any type of harassment, discrimination, or retaliation

are the policy acknowledgements that Defendants have produced." Doc. 126 at 9.

Bogus also requests unspecified "[d]ocuments relating to previous lawsuits and complaints." Doc. 121 at 8. Bogus had asked in interrogatories for all "details regarding any allegations and lawsuits by any previous employee(s) against the City of Birmingham and the Birmingham Police Department in the past ten (10) years . . . in which employees claimed discrimination and retaliation [under] Title VII[.]" Doc. 121 at 16. This request is far too broad since it is not tailored to discrimination or retaliation claims that might be relevant to Bogus' claims here and also includes employees who did not work for BPD. Moreover, lawsuits filed in state or federal court are publicly available information that is already accessible to Bogus through a public records search. Finally, the Eleventh Circuit has held that "evidence of other acts of discrimination by the *same decision-maker* against other employees in the *plaintiff's protected group*" may be relevant to a Title VII claim. *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1341 (11th Cir. 2011) (emphasis added). Bogus' request is substantially broader.

Finally, Bogus seeks "[d]ocuments relating to members of Bell's staff, who violated criminal statutes and violated duly promulgated, official rules and regulations." Doc. 121 at 9. She claims that "Bell allowed members of his staff to violate criminal statutes, official rules, and regulations far worse than [her] actions while pregnant." Doc. 121 at 10. While the request is vague and inarguably

overbroad, Bogus' request implies that other members of Mayor Bell's security detail engaged in misconduct and were treated more favorably than the treatment she received. But Bogus has not identified anyone who purportedly engaged in misconduct or explained which "criminal statutes and . . . official rules and regulations" were violated. Moreover, to demonstrate disparate treatment, Bogus must point to coworkers who were "similarly situated in all material respects." *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1229 (11th Cir. 2019). Bogus does not identify any individuals who were purportedly involved in similar conduct, subject to the same supervisor, and who shared the same rank. *See id.* at 1227–28. Accordingly, Bogus' motion to compel is due to be denied on its merits if not for its unjustified delay.

## B.  Motion for Summary Judgment

### 1.  *Statute of Limitations and Exhaustion of Administrative Remedies*

In its April 11, 2018 opinion resolving the defendants' motion to dismiss, the court found that "Title VII claims based on any discriminatory, hostile, or retaliatory actions by the City that occurred prior to October 2, 2014, are time-barred because such actions were outside the 180-day time limit for the filing of [Bogus'] EEOC charge." Doc. 32 at 21. The court calculated this date based on the filing of Bogus' first EEOC charge on March 31, 2015. Doc. 32 at 21. The court further found that any discrimination, hostile work environment, or retaliation claim based on events

occurring after March 31, 2015 must have been included in Bogus' January 19, 2016 charge "unless such events were reasonably related to the original 2015 charge." Doc. 32 at 22. "Thus, allegedly *discrete* discriminatory or retaliatory actions by the City occurring after the filing of the March 2015 charge but before July 23, 2015" would also be time-barred. Doc. 32 at 22–23. Specifically related to Bogus' hostile work environment claim against Harris, the court concluded that the limitations period "cuts off any claims arising from Harris's romantic overtures to the plaintiff during the summer of 2014." Doc. 32 at 23. The court also dismissed any claim under the Equal Protection Clause that accrued prior to May 19, 2015 under 42 U.S.C. § 1983's two-year statute of limitations. Doc. 32 at 39.

Additionally, the court previously noted that the statute of limitations for 42 U.S.C. § 1981 claims in Alabama is "two years after the plaintiff 'knows or reasonably should know that the discriminatory act has occurred, the same point from which the Title VII 180-day limitations period runs.'" Doc. 32 at 21 n.16 (quoting *Stafford v. Muscogee Cty. Bd. of Educ.*, 688 F.2d 1383, 1390 (11th Cir. 1982)). Nevertheless, because the defendants had not moved for the dismissal of Bogus' § 1981 claims on this basis, these claims survived "against the City and the individual defendants in their personal capacities only." Doc. 32 at 21 n.16 (emphasis omitted).

The defendants assert that any claim based on a denial of opportunities for

overtime is time-barred because Bogus complained to Harris about missing out of overtime in September 2014 and has not alleged or submitted any evidence that "she was denied overtime opportunities after October 2, 2014 (180 days before her 2015 charge was filed)." Doc. 111 at 31. The defendants further argue that Bogus failed to exhaust her administrative remedies with respect to any claim based on a denial of overtime because she did not mention a denial of overtime opportunities in her 2015 EEOC charge. Doc. 111 at 32–33.

As the defendants recognize, Bogus complained to Harris about a purported lack of opportunities for overtime on October 9, 2014, one week after the limitations period began for her 2015 EEOC charge. Doc. 112-1 at 37. And Bogus' email to Harris on October 10, 2014 related in part to conduct that occurred on October 2, October 8, and October 10. Doc. 112-8 at 11. Nevertheless, the denial of overtime opportunities is not Bogus' only allegation of disparate treatment, as she also claims that she suffered discrimination by her exclusion from the West Precinct email list, by the denial of her choice of shifts, and by the reassignment from the Mayor's security detail. Thus, any denial of overtime is just one component of the factual predicate for Bogus' disparate treatment claim. In any event, as will be soon discussed, any Title VII, § 1981, or § 1983 claim based on a theory of disparate treatment is due for dismissal on its merits regardless of its timeliness.

Further, the court cannot agree with the defendants' narrow reading of Bogus'

2015 EEOC charge.  In it, Bogus complains that once she refused to sign a waiver following the Beam investigation, she was "subjected to discriminatory treatment." Doc. 3-1 at 2.  She explains that she was reassigned in January 2015 after she disclosed her pregnancy to BPD. Doc. 3-1 at 2.  Bogus concludes by claiming that once her relationship with Tubbs "became public, [she] was punished for being a black female who had a relationship with a white superior." Doc. 3-1 at 2.

A plaintiff's suit is "limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination." *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1332 (11th Cir. 2000) (citation and internal quotation marks omitted).  Claims are permissible if they "amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but . . . allegations of new acts of discrimination are inappropriate." *Gregory v. Ga. Dep't of Human Res.*, 355 F.3d 1277, 1279–80 (11th Cir. 2004) (internal quotation marks omitted).  "The proper inquiry is whether the complaint is like or related to, or grew out of, the allegations contained in the relevant charge." *Kelly v. Dun & Bradstreet, Inc.*, 557 F. App'x 896, 899 (11th Cir. 2014).  And, importantly, "courts are . . . extremely reluctant to allow procedural technicalities to bar claims brought under Title VII." *Gregory*, 355 F.3d at 1280 (internal quotation marks omitted).  Accordingly, "the scope of an EEOC complaint should not be strictly interpreted." *Id.*

Bogus' allegation that she was denied overtime opportunities, like her other

alleged discrimination, is at least "like or related to" and could have grown out of an EEOC investigation into her complaint that she was "punished" for having an interracial relationship and biracial child with Tubbs. BPD was aware of and investigated Bogus' relationship with Tubbs in September 2014, and Bogus became pregnant in October 2014. Harris testified that he was aware of Bogus' relationship with Tubbs in September 2014. Doc. 112-8 at 3. This particular allegation—like Bogus' allegations that she was discriminatorily reassigned, denied a shift accommodation, and taken off of an email list—is closely related to the gravamen of her EEOC complaint that she was mistreated because of her relationship with Tubbs and her pregnancy. Thus, the court will address the merits of Bogus' claims.

## 2. Title VII, 42 U.S.C. § 1981, and Equal Protection

As outlined above, the following claims remain pending: Title VII discrimination on the basis of Bogus' pregnancy and interracial relationship, retaliation, and hostile work environment; 42 U.S.C. § 1983 First Amendment retaliation and Equal Protection Clause violations; and 42 U.S.C. § 1981 race discrimination in contract. Many of Bogus' claims, of course, are supported by overlapping factual allegations. Moreover, "discrimination claims, including hostile work environment claims, brought under the Equal Protection Clause, 42 U.S.C. § 1981, or Title VII . . . are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n.20 (11th Cir.

2009).  The court therefore combines its analysis of Bogus' employment discrimination claims.

Title VII claims are "typically categorized as either mixed-motive or single-motive claims." *Quigg v. Thomas County Sch. Dist.*, 814 F.3d 1227, 1235 (11th Cir. 2016).  A mixed-motive claim is based on the allegation that "illegal bias, such as bias based on sex or gender, 'was a motivating factor for' an adverse employment action, 'even though other factors also motivated' the action." *Id.* (quoting 42 U.S.C. § 2000e-2(m)).  Single-motive claims, on the other hand, "require a showing that bias was the true reason for the adverse action." *Id.*  Both single-motive and mixed-motive claims "can be established with either direct or circumstantial evidence." *Id.*  Here, regardless of whether her claims are characterized as single-motive or mixed-motive, Bogus has failed to adduce any evidence of a discriminatory motive animating the defendants' employment decisions.

Single-motive claims require the application of the familiar *McDonnell Douglas* burden-shifting analysis. *Quigg*, 814 F.3d at 1237.  The plaintiff first must establish a *prima facie* case of discrimination. *Id.*  If she does so, the employer must provide a legitimate, nondiscriminatory reason for its decisions. *Id.*  If the employer satisfies this burden, the onus shifts back to the plaintiff to show that the employer's nondiscriminatory reason is "mere pretext" for discrimination. *Id.*

### a. *Prima Facie* **Case**

To establish a *prima facie* case of race discrimination, Bogus must show that (1) she is a part of a protected class; (2) she was qualified for his position; (3) she was subjected to an adverse employment action; and (4) BPD treated similarly situated employees outside her protected class more favorably. *Crawford v. Carroll*, 529 F.3d 961, 970 (11th Cir. 2008). In disparate treatment claims, the plaintiff must identify comparators who are "similarly situated in all material respects." *Lewis*, 918 F.3d at 1229. Thus, "a plaintiff and her comparators must be sufficiently similar, in an objective sense, that they 'cannot reasonably be distinguished.'" *Id.* at 1228 (quoting *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 231 (2015)).

Bogus' claims based on the denial of overtime opportunities, reassignment from the Mayor's security detail, and the denial of a permanent shift accommodation fail because she has not met her burden to establish a *prima facie* case of employment discrimination for any of these theories of liability. More specifically, Bogus cannot show that the purported denial of overtime opportunities, her reassignment, and the failure to earn a permanent shift accommodation were adverse employment actions. Further, even accepting Bogus' version of events, she cannot show that similarly situated individuals from outside her protected class were treated more favorably.

### i. *Denial of Overtime*

Bogus' claim based on a denial of overtime opportunities, even if timely, fails

because she has not submitted evidence showing that she was, in fact, denied the opportunity to seek overtime. Conversely, Harris testified by declaration that Bogus had the same opportunities to earn overtime as the other officers assigned to the Mayor's security detail based on a rotation, and that he did not have control over the number of hours each officer worked. Doc. 112-8 at 1–2 & 6. Bogus has failed to demonstrate "that she was prevented from working overtime or how much overtime she lost" due to BPD's actions. *Collins v. Miami-Dade County*, 361 F. Supp. 2d 1362, 1372 (S.D. Fla. 2005). Accordingly, any employment discrimination claim based on a purported denial of overtime opportunities falls short.

Moreover, even if Bogus had been passed over for overtime assignments while serving on the Mayor's security detail, she has failed to point to any evidence that she was "both qualified and available to work overtime under" BPD's system for assigning overtime to security detail employees, but "passed over in favor of someone else." *Osahar v. Postmaster Gen. of U.S. Postal Serv.*, 263 F. App'x 753, 762 (11th Cir. 2008). From January 2014 to January 2015, two black men worked fewer overtime hours than Bogus. Docs. 112-5 at 2 & 112-8 at 6. And for those who worked more than Bogus, she has made no showing that these individuals were granted more opportunities for overtime than she was, especially given the record evidence establishing that Bogus had turned down overtime opportunities on multiple occasions. Doc. 112-8 at 6. Accordingly, Bogus cannot establish a *prima*

*facie* case of employment discrimination based on the allegation that she was denied opportunities for overtime compensation.

## ii. *Reassignment*

Similarly, Bogus cannot establish a *prima facie* employment discrimination case based on her claim that she was reassigned for discriminatory reasons. Bogus was reassigned from the Mayor's security detail following a complaint and investigation into her purported threat to kill a coworker and his family and alleged harassment electronically and in person. Doc. 112-1 at 29; Doc. 112-5 at 3; Doc. 112-6 at 1. Nevertheless, Harris and Mayor Bell both testified that the complaint and investigation played no role in transferring Bogus—explaining that the decision to reassign her was Chief Roper's, and Bogus has failed to rebut this contention with any evidence of her own.[1] Docs. 112-7 at 4 & 112-8 at 5. Moreover, Harris and Mayor Bell were not aware of Bogus' pregnancy until after she had been placed on administrative leave and the investigation into her relationship with Tubbs had commenced. Docs. 112-7 at 4 & 112-8 at 5. Accordingly, even though Harris and Mayor Bell were aware of Bogus' relationship with Tubbs at the time of her

---

[1] While the defendants repeatedly assert that Chief Roper made the decision to reassign Bogus, they do not explain what, if anything, Chief Roper knew about Tubbs' complaint or the Beam investigation at the time of his decision. Nor do they provide a clear reason for Bogus' reassignment. Bogus speculated in her deposition that Chief Roper was aware of Tubbs' complaint and the Beam investigation because Odom complained to Chief Roper. *See* Doc. 112-1 at 60 ("I know [Chief Roper knew] about the stuff with Matt Beam because April Odom complained to him about Matt Beam stuff."). This evidentiary gap is unresolved by the record before the court.

reassignment, *see* Docs. 112-7 at 3 & 112-8 at 5, Bogus has made no demonstration that the reassignment occurred because of her sex, interracial relationship, or pregnancy.

Further, Bogus fails to meet her burden at the *prima facie* stage because she cannot show that her reassignment from the security detail constituted an adverse employment action. Under Title VII, an adverse employment action is a decision that impacts the "terms, conditions, or privileges of the plaintiff's job in a real and demonstrable way." *Davis v. Town of Lake Park, Fla.*, 245 F.3d 1232, 1238 (11th Cir. 2001). "The impact must be serious and material, and a reasonable person in the circumstances presented must have found that the action was materially adverse." *Mills v. Cellco Partnership*, 376 F. Supp. 3d 1228, 1237 (N.D. Ala. 2019) (internal quotation marks omitted).

Bogus has made no showing that her reassignment from the Mayor's security detail materially affected the terms, conditions, or privileges of her employment "in a real and demonstrable way." *Davis*, 245 F.3d at 1238. Her rate of pay was unaffected by her reassignment. Docs. 112-1 at 30 & 112-5 at 3. And, even after her reassignment, Bogus was promoted to Sergeant and earned an increase in salary. Bogus did not testify in her deposition, let alone adduce any other evidence, that the terms and conditions of her employment were materially affected during January to July 2015. Bogus has not shown that her reassignment during this time constituted

an adverse employment action.

Even if her reassignment had been an adverse employment action, Bogus cannot establish a *prima facie* case of employment discrimination based on her reassignment because she has not identified any similarly situated coworkers who were treated differently. "When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, [the court] evaluate[s] whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (internal quotation marks omitted). Such an evaluation may also include an examination of "the employees' records with respect to their histories of problems with coworkers or supervisors, job performance, tardiness, absenteeism, and responsiveness to performance evaluations." *Jiles v. United Parcel Serv., Inc.*, 360 F. App'x 61, 64 (11th Cir. 2010). Bogus has not pointed to any coworker facing a complaint and investigation into similar conduct—much less one who was treated more favorably. Thus, Bogus cannot establish a *prima facie* employment discrimination claim based on her reassignment.

### iii. *Shift Accommodation*

Finally, Bogus cannot establish a *prima facie* case based on BPD's purported failure to accommodate her scheduling preferences. Bogus does not dispute that BPD provided an accommodation when it granted her a six-week personal hardship,

enabling her to work on the day shift. In any event, even if BPD had not accommodated Bogus' request, Bogus has not shown that her assignment to the night shift had any tangible adverse effect on the terms and conditions of her employment.

Further, Bogus has not identified any coworkers who received a better or permanent shift accommodation after making a similar request. Instead, during the HR investigation into her complaints, Bogus identified four individuals who were allegedly treated more favorably—Colston, Bishop, Calhoun, and Washington. But Bogus has not submitted any evidence that any of these four individuals received a permanent shift accommodation. In fact, the record reflects that Washington and Calhoun were granted temporary accommodations. Moreover, even if she had produced or identified evidence that Colston or Bishop received permanent shift accommodations, she cannot demonstrate that they were similarly situated to her because they were not Sergeants when they made an accommodation request, and "material differences in . . . respective rank and job responsibilities" weigh against a finding that employees are similarly situated. *Rioux v. City of Atlanta, Ga.*, 520 F.3d 1269, 1281 (11th Cir. 2008). Any employment discrimination claim based on BPD's purported failure to provide Bogus with a shift accommodation is due for summary judgment.

### b.  Mosaic of Circumstantial Evidence

As the Eleventh Circuit has recognized, "establishing the elements of the *McDonnell Douglas* framework is not . . . the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case." *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  Even in the absence of proper comparators, a plaintiff "will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." *Id.*  "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." *Id.* (internal quotation marks omitted).

Far from a convincing mosaic, Bogus' circumstantial evidence is unpersuasive and virtually nonexistent.  Essentially, Bogus contends that BPD took various actions against her because of her interracial relationship and biracial child, but she has not come forth with sufficient circumstantial evidence that these factors played a role in any of BPD's personnel decisions.  Bogus has pointed to no material evidence in the record showing that BPD had a motive to discriminate against her; to past instances of discrimination in similar circumstances; or to any examples of BPD's "conscious tracking of" race, sex, or an employee's relationships in its decisionmaking. *See Moultrie v. Ga. Dep't of Corr.*, 703 F. App'x 900, 907 (11th

Cir. 2017) (noting that the plaintiff's evidence was weaker than the evidence presented in *Smith*, 644 F.3d 1328, which first established the "convincing mosaic of circumstantial evidence" test, because the plaintiff did not demonstrate "a motive to discriminate, incidents of white and black employees being treated differently, and the employer's conscious tracking of race in disciplinary decisions"). Because Bogus has not put forth sufficient evidence of discrimination, the convincing mosaic of circumstantial evidence test does not salvage any of her employment discrimination claims.

### c.    Mixed-Motive Analysis

For mixed-motive claims, the plaintiff must produce "evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) a protected characteristic was a motivating factor for the defendant's adverse employment action." *Quigg*, 814 F.3d at 1239 (internal quotation marks omitted) (emphasis omitted). Thus, a reasonable jury must be able to conclude, "by a preponderance of the evidence, that [Bogus' race] was a motivating factor for an adverse employment decision." *Id.* The Eleventh Circuit has characterized this as a "straightforward inquiry into whether the plaintiff has presented sufficient evidence of mixed-motive discrimination to establish a jury issue." *Id.* at 1240.

A plaintiff may demonstrate that a protected characteristic was a motivating

factor in the employer's decisionmaking by pointing to "remarks that indirectly evidence discrimination" as long as the context of the remarks shows "that the employer actually relied on [the plaintiff's protected characteristic[s]] in making its decision." *Quigg*, 814 F.3d at 1241 (internal quotation marks omitted). Where statements are "far from stray remarks," but rather are made in close temporal proximity to the decision during conversations about the decision, a plaintiff can show that a jury issue exists with respect to whether her protected characteristic was a motivating factor in the employer's decisionmaking. *Id.* at 1241–42.

Here, apart from her own speculation, Bogus has not identified any comments by Irwin, Harris, Mayor Bell, or anyone else at BPD regarding her race, gender, interracial relationship, or biracial child. Even if she had, Bogus has not shown that any statement was made in close temporal proximity or logically tied to any of the challenged employment decisions. Accordingly, Bogus cannot show that there is a triable issue of fact with respect to whether one of her protected characteristics was a motivating factor for any of BPD's employment decisions.

### 4. *Retaliation*

Bogus' claim for retaliation in response to her complaints during the Internal Affairs investigation, to Harris about a lack of overtime, and about the lack of a shift accommodation is unsupported by any evidence in the record. Under Title VII, an employee has suffered an adverse employment action for the purposes of a

retaliation claim if the "employer's action would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Mills*, 376 F. Supp. 3d at 1244 (quoting *Burlington N. & Santa Fe R.R. Co. v. White*, 548 U.S. 53, 68 (2006) (alteration included)). An adverse employment action must be "judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Burlington*, 548 U.S. at 70–71. Importantly, the Eleventh Circuit has pointed out that the Supreme Court's decision in *Burlington* "strongly suggests that it is for a jury to decide whether anything more than the most petty and trivial actions against an employee should be considered 'materially adverse' to [her] and thus constitute adverse employment actions." *Crawford*, 529 F.3d at 973–74.

Even assuming that under this more lenient standard Bogus has shown that she suffered an adverse employment action for the purposes of a retaliation claim, she has made no showing that any allegedly retaliatory act by any of the defendants resulted from one of her complaints. There is simply no evidence in the record, whether direct or circumstantial, demonstrating a causal connection between protected activity and an adverse employment action. Conversely, there is ample evidence in the record that the defendants' decisions were unrelated to any of Bogus' complaints. Thus, there is no triable issue of fact with respect to a claim for retaliation.

For example, before Bogus complained about Irwin's unwillingness to grant

her a permanent shift accommodation in February 2016, he had explained to her that he was not permitted to allow her to work any shift she desired. Doc. 112-9 at 5. Similarly, Bogus has not drawn any direct or circumstantial connection between one of her complaints and a lack of overtime opportunities—notwithstanding the fact that Bogus has not pointed to any evidence showing that she was, in fact, intentionally denied opportunities for overtime.

### 5.    *Hostile Work Environment*

To establish a *prima facie* case of harassment or hostile work environment, Bogus must show that: (1) she belongs to a protected class, (2) she was subjected to unwelcome harassment, (3) the harassment was based on one or more protected characteristics, (4) the harassment was "sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment," and (5) there is a basis for holding the City liable for this behavior. *Thompson v. Carrier Corp.*, 358 F. App'x 109, 113–14 (11th Cir. 2009).

Bogus has pointed to no evidence in the record that Harris, Irwin, or Mayor Bell engaged in activity rising to the level of hostile or harassing. Even Harris' conduct—which allegedly consists of unidentified phone calls, text messages, and "gestures"—viewed in the light most favorable to Bogus, does not rise to the level

of severity or pervasiveness to "alter the terms and conditions of employment."[2] *Thompson*, 358 F. App'x at 114. Bogus also alleges that Irwin denied her a shift accommodation, treated her differently than her male coworkers, and intentionally excluded her from West Precinct emails. Doc. 112-1 at 10–11. But none of this conduct, even if true, is severe or pervasive enough to serve as the basis for a hostile work environment claim. *See, e.g.*, *Naples Comm. Hosp., Inc.*, 433 F. App'x 797, 800 (11th Cir. 2011) (holding that lack of communication, "petty slights," and angry outbursts were not sufficiently severe or pervasive to establish a hostile work environment claim).

Bogus does not identify specific harassing statements or a pattern of harassing behavior—or explain how any such behavior affected the terms and conditions of her employment at any point during her time at BPD. Even if Bogus were able to demonstrate that she was subjected to harassment, she has not shown that the City either knew or should have known about the harassment and failed to take any action to combat it. This shortcoming is fatal to any hostile work environment claim under Title VII.

### 6. *42 U.S.C. § 1983*

The individual defendants are entitled to qualified immunity with respect to

---

[2] Any claim based on Harris' alleged conduct also would fail because it occurred more than 180 days prior to the filing of Bogus' first EEOC charge of discrimination in March 2015. *See* Doc. 32 at 23–24.

any § 1983 claim because Bogus has not shown that any of her constitutional rights were violated.  To establish a First Amendment retaliation claim, a plaintiff must show: (1) she engaged in speech protected by the First Amendment, (2) the defendants retaliated against the plaintiff in a way that affected her protected speech, and (3) a causal connection exists between the defendant's alleged retaliation and the adverse effect on the plaintiff's speech. *DeMartini v. Town of Gulf Stream*, 942 F.3d 1277, 1289 (11th Cir. 2019).  "[W]hen public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006).  But statements "by a public employee outside the scope of [her] ordinary job duties [constitute] speech as a citizen for First Amendment purposes." *Lane v. Franks*, 573 U.S. 228, 238 (2014).

"In § 1983 First Amendment retaliation cases, the Supreme Court has recognized that retaliatory animus by a governmental actor is a subjective condition that is 'easy to allege and hard to disprove.'" *Id.* (quoting *Nieves v. Bartlett*, 139 S. Ct. 1715, 1725 (2019)).  When a government employee alleges that she has been terminated because she engaged in speech protected by the First Amendment, the court "looks to whether the defendant governmental employer's retaliatory motivation was the but-for cause of the adverse employment decision." *Id.*  If not,

and the employer would have fired the employee in the absence of "a retaliatory animus motivating that conduct," a First Amendment retaliation claim cannot survive. *Id.*

For many of the same reasons that Bogus' employment discrimination claims are due to be dismissed, Bogus has not shown that she suffered a violation of her First Amendment right to free speech. Bogus' constitutional claim is based on Irwin's purported retaliation against her for her complaints to HR. But Bogus' complaints to HR arose out of issues specific to her employment, not issues of public concern. Accordingly, Bogus was not speaking as a citizen when she complained to HR about Irwin, and her speech falls outside the ambit of First Amendment protection.

Moreover, as discussed above, Bogus has pointed to no evidence in the record demonstrating a causal link between her protected speech and any purportedly retaliatory acts. At most, Bogus has put forth mere speculation and conjecture, which "cannot create a *genuine* issue of fact." *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005). For all of these reasons, Bogus' claim for First Amendment retaliation, like all of her other claims, is unsupported by any evidence in the record and cannot survive summary judgment.

## V. CONCLUSION

For these reasons, it is ORDERED that the Supplemental Motion to Compel

(Doc. 121) is DENIED.

It is further ORDERED that Defendants' Motion for Summary Judgment (Doc. 110) is GRANTED, and all claims asserted by Plaintiff Kesha LaShawn Bogus are DISMISSED with prejudice.

A final judgment will be entered separately.

DONE and ORDERED on February 12, 2020.

_____
GRAY M. BORDEN
UNITED STATES MAGISTRATE JUDGE